M. Susan **HAINES**, Plaintiff,

v.

**LIGGETT GROUP, INC.,
et al., Defendants.**

Civ. A. No. 84–678 (AJL).

United States District Court,
D. New Jersey.

Jan. 26, 1993.

Donald P. Jacobs, Budd Larner Gross Rosenbaum Greenberg & Sade, P.C., Short Hills, NJ, and Alan M. Darnell, Wilentz Goldman & Spitzer, Woodbridge, NJ, for plaintiff.

Alan S. Naar, Greenbaum Rowe Smith Ravin Davis & Bergstein, Woodbridge, NJ, and James V. Kearney, Pat Carty, Mudge Rose Guthrie Alexander & Ferdon, New York City, for defendant Liggett Group, Inc.

William S. Tucker, Jr., Joseph E. Kinsella, Stryker, Tams & Dill, Newark, NJ, for defendant Loew's Theatres.

Thomas Silfen, Arnold & Porter, Washington, DC, and John J. Mulderig, Brown & Connery, Westmont, NJ, and William Allinder, Shook, Hardy & Bacon, Kansas City, MO, for defendant Phillip Morris, Inc.

Alan Kraus, Riker, Danzig, Sherer, Hyland & Perretti, Morristown, NJ, and Robert C. Weber, John Strauth, Jones, Day, Reavis & Pogue, Cleveland, OH, for defendant R.J. Reynolds Tobacco Co.

## OPINION

LECHNER, District Judge.

Currently before the court is the motion of Budd Larner Gross Rosenbaum Greenberg & Sade, P.C. ("Budd Larner") to withdraw as counsel for M. Susan Haines ("Haines"), plaintiff in the above-captioned matter.[1] For the following reasons, the motion is denied.

## FACTS

### A. Background

In the Spring of 1983, three New Jersey law firms—Budd Larner; Porzio, Bromberg & Newman ("Porzio"); and Wilentz Goldman and Spitzer ("Wilentz")—entered into an agreement (the "Litigation Agreement") whereby they agreed jointly to litigate cigarette-related health claims on behalf of smokers who developed lung cancer, allegedly from smoking. Edell Aff., ¶ 3; Moving Brief at 2. Ultimately, as a result of the Litigation Agreement, eight cases (the "Cigarette Cases") were filed against various cigarette companies, including: *Cipollone v. Liggett Group, Inc., et al.*, No. 83–2864 (D.N.J.);

*Dewey v. R.J. Reynolds Tobacco Co., et al.*, 216 N.J.Super. 347, 523 A.2d 712 (Law Div.); *Berko v. R.J. Reynolds Tobacco Co., et al.*, (N.J.Super.Ct.Law Div.), see 246 N.J.Super 348, 587 A.2d 667 (App.Div.1991); *Barnes v. R.J. Reynolds Tobacco Co., et al.* (N.J.Super.Ct.Law Div.), see 246 N.J.Super 348, 587 A.2d 667 (App.Div.1991); *Smith v. R.J. Reynolds Tobacco Co., et al.*, No. L–059921–84 (N.J.Super.Ct.Law Div.); and the instant case, *Haines v. Liggett Group, Inc., et al.*, No. 84–678 (AJL) (D.N.J.).[2] Edell Aff., ¶ 2; Moving Brief at 2.

The Litigation Agreement continued until March 1986, when Marc Z. Edell ("Edell") left Porzio to join Budd Larner. Edell Aff., ¶ 3; Moving Brief at 2. Thereafter, only Budd Larner and Wilentz litigated the Cigarette Cases, with the exception of *Haines*, the instant case. Edell Aff., ¶ 3. On 29 September 1988, Wilentz was disqualified in *Haines* by Magistrate Judge Ronald Hedges, as a result of a decision by the New Jersey Supreme Court in *Dewey v. R.J. Reynolds Tobacco Co.*, 109 N.J. 201, 536 A.2d 243 (1988). Edell Aff., ¶ 3. Since 29 September 1988, Budd Larner has assumed sole legal and financial responsibility for this case. Moving Brief at 2.

In each of the Cigarette Cases, including the present case, Budd Larner, Porzio and Wilentz entered into contingency fee agreements with the various plaintiffs. Moving Brief at 15. Pursuant to these contingency fee agreements, the expenses of litigation have been borne exclusively by Budd Larner and the other law firms.[3] *Id.* According to Budd Larner, "[n]o client has expended even

---

1. In support of its motion to withdraw, Budd Larner has submitted the following: Brief in Support of Motion for Leave to Withdraw as Counsel (the "Moving Brief"); Affidavit of Marc Z. Edell (the "Edell Aff."); Affidavit of Thomas F. Campion (the "Campion Aff."); Affidavit of Donald P. Jacobs; Affidavit of Fred S. McChesney (the "McChesney Aff.");

    Affidavit of Charles W. Wolfram; Letter Reply Brief in Support of Motion to Withdraw as Counsel (the "Reply Brief").

    In opposition to the motion to withdraw, Haines has submitted the following: Brief in Opposition to Budd Larner's Motion for Leave to Withdraw as Counsel (the "Opp. Brief").

    The defendants have submitted a letter, dated 11 January 1993 in which, *inter alia*, Defendants indicate they "take no position on the merits of Budd Larner's motion." *Id.*

2. The remaining two cases were *Flynn v. American Tobacco Co.* and *Reach v. Liggett Group, Inc., et al. See* Edell Aff., ¶ 2; Moving Brief at 2. Citations for these cases are unavailable and have not been provided.

3. Budd Larner states that it did not directly enter into the contingency fee agreement in this case. Moving Brief at 17 n. 5. Rather, the contingency fee agreement was entered into by Porzio and was later succeeded to by Budd Larner upon Edell's joining the latter firm. *Id.*

a single dollar toward satisfaction of those costs; the expenses are recoverable only if plaintiffs prevail at trial—in which case those sums will be deducted from plaintiffs' share of the judgments." *Id.*

At the present time, of the original eight cases filed under the Litigation Agreement, Budd Larner remains as counsel only in the present case and possibly one other.[4]

B. *The Parties and Claims*

On 22 February 1984, this case was filed by Haines as administrator of the estate of Peter F. Rossi ("Rossi"). Edell Aff., Ex. F (letter to Magistrate Judge Joel A. Pisano, dated 2 October 1992) (the "2 Oct. 1992 Letter") at 1. The defendants (the "Defendants") in this case are Liggett Group, Inc. (the "Liggett Group"), Loew's Theatres, Inc. ("Lorillard"), Phillip Morris, Inc. ("Phillip Morris"), R.J. Reynolds Tobacco Co. ("RJR") and the Tobacco Institute.[5] *Id.* at 1–2. Haines alleges, *inter alia*, that Rossi developed lung cancer and died on 28 May 1982 as a result of smoking cigarettes manufactured by Defendants.[6] *Id.* at 2.

Haines alleges numerous grounds for recovery. First, Haines asserts a claim for "risk-utility" as to all Defendants. The essence of this claim is that the cigarettes manufactured by Defendants "were not reasonably fit, suitable or safe for their intended or reasonably foreseeable use because the dangers of smoking so outweigh their usefulness that a reasonably prudent manufacturer would not have sold them." *Id.* at 5.

Second, Haines asserts a claim for failure to warn against all Defendants. *Id.* Specifi-

cally, Haines alleges that, through their advertising and promotion of cigarettes prior to 1969, Liggett Group and Lorillard failed to adequately warn of the health consequences of smoking. *Id.* Haines also alleges under this claim that all Defendants "failed to adequately test, research and warn of the health consequences of smoking through means other than advertising." *Id.* at 6. Haines seeks both compensatory and punitive damages on the failure to warn claim. *Id.*

Third, Haines brings a claim for breach of express warranty as to all Defendants. *Id.* Haines alleges that Defendants made express promises or affirmations of fact that the cigarettes they sold to Rossi would not cause injury or harm, that these alleged statements were part of the bargain between Defendants and consumers like Rossi, and that Defendants' cigarettes used by Rossi failed to conform to the alleged affirmations of fact or promises made to Rossi and proximately caused his death. *Id.*

Fourth, Haines asserts claims in intentional tort—for fraud and conspiracy—alleging that Defendants "individually and in concert, concealed and intentionally failed to disclose significant and material information and data regarding the health consequences of smoking." *Id.* at 7. Moreover, Haines alleges that Defendants, "through their advertising, promotion, and other practices, distorted and otherwise misrepresented the health effects of smoking to the public." *Id.* Haines contends that Rossi, individually and/or as a member of the general public, relied on these alleged misrepresentations and omissions. *Id.* Haines seeks compensatory and punitive damages on these intentional tort claims. *Id.*

---

4. In a number of the Cigarette Cases, plaintiffs have consented to a voluntary dismissal of their actions. On 4 November 1992, the Cipollones' son consented to a voluntary dismissal with prejudice of *Cipollone*. Moving Brief at 5. Voluntary dismissals have also occurred in *Barnes*, *Berko*, *Dewey* and *Flynn*. *See* Schroth, "Poking the Ashes of Tobacco Liability; Why Five Suits Against the Industry Were Dropped in a Single Day," *N.J.L.J.* 1 (16 Nov. 1992); *see also Financial Times* (20 Nov. 1992). In at least one other case, *Smith v. R.J. Reynolds Tobacco Co.*, Budd Larner has been permitted to withdraw. *See* Reply Brief at 2–3. The status of *Reach* is unknown.

5. On 30 September 1992, suit against the Tobacco Institute was voluntarily dismissed. *See* Consent Order, filed 30 September 1992.

6. It is alleged that Rossi smoked the following brands of cigarettes during the following time periods: (1) Chesterfield, from 1942 to the early or mid–1950s (produced by Liggett Group); (2) Kent, from the early to mid–1950s to the mid–1960s (produced by Lorillard); (3) True, from the mid–1960s to 1982 (produced by Lorillard); (4) Vantage, from the early to mid–1970s to 1982 (produced by RJR); and (5) Merit, from 1979 to 1982 (produced by Phillip Morris). 2 Oct. 1992 Letter at 2.

On 14 September 1992, by order of the Third Circuit, 975 F.2d 81, this case was reassigned from United States District Judge H. Lee Sarokin to this court. *Id.* at 4. On 16 November 1992, Budd Larner filed this motion to withdraw.

## DISCUSSION

### A. *Arguments by Budd Larner For Withdrawal*

Budd Larner argues it should be granted permission to withdraw from this case because litigation against the cigarette industry "has become an unreasonable financial burden." Moving Brief at 1. Budd Larner indicates that, although it has entered into "thousands of contingency arrangements over the years, ... it has rarely, if ever, sought to be relieved as counsel because of litigation costs." *Id.* at 17.

Budd Larner insists "this is not a typical case." *Id.* Budd Larner argues:

> [This] is a case that must be viewed in the context of the past ten years of litigation, which have demonstrated that the costs of litigating against the tobacco industry are far greater than anyone could have reasonably expected at the time the contingency contract was signed.

*Id.*

According to Budd Larner, the three firms have expended significant amounts of money and time in litigating these eight cases against the cigarette industry. *Id.* at 2. Specifically, Budd Larner states:

> [T]he firms have incurred approximately $1.2 million in out-of-pocket expenses (not including the costs of more than one million Xerox copies made in house), of which Budd Larner has paid more than $500,000.

> The firms have also spent well over $5 million in lawyer and paralegal time, of which Budd Larner was responsible for the largest share—approximately 75%.

*Id.* at 3; Edell Aff., ¶ 4(a).

Budd Larner does not specify how much money or time it has spent to date in litigating *Haines*.[7] Nevertheless, Budd Larner suggests that "[t]o approximate the costs of litigating the present case through trial, one need look no further than Budd Larner's experience in *Cipollone*."[8] Moving Brief at 6, 15–16; Edell Aff., ¶ 6. According to Budd Larner:

> From approximately the procedural point where *Haines* is today through trial, the *Cipollone* case cost more than $500,000 in out-of-pocket expenses and approximately $2 million in lawyer and paralegal time. There is no reason to believe that *Haines* could be tried any more quickly than *Cipollone*, which took four months to try.

Moving Brief at 7; *see also id.* at 16; Edell Aff., ¶ 6. In fact, Budd Larner predicts that trying *Haines* "might very well take longer" than litigating *Cipollone* because "*Haines* is not restricted to defendants' pre–1966 tortious conduct ... and it includes a risk/utility claim by plaintiff." Moving Brief at 7; Edell Aff., ¶ 6.

Budd Larner also suggests that *Cipollone* should serve as a model for the type of post-trial activity that can be expected in this case. According to Budd Larner:

> In *Cipollone*, almost half of the ten years since the case was filed was spent on post-trial matters. During that period, Budd Larner incurred approximately $150,000 in

7. Budd Larner states, however, that in the eight cases as a whole, Defendants have taken two hundred twenty-two days of fact-witness depositions and seventy days of expert witness depositions, while plaintiffs have taken eighty days of fact-witness depositions and twenty-seven days of expert witness depositions. Moving Brief at 3; Edell Aff., ¶ 4(b). Budd Larner calculates that for every day of deposition in the eight cases, plaintiffs' attorneys "spent approximately one and a half days in preparation." Moving Brief at 3; Edell Aff., ¶ 4(b). Budd Larner thus estimates that, in total, "the deposition process has con-

sumed approximately 1,000 days; translated into standard work weeks of Monday through Friday, that is approximately four years' worth of depositions." Moving Brief at 3 (emphasis deleted). Finally, Budd Larner indicates that, in *Cipollone* alone, more than one hundred motions were filed. *Id.* at 3–4; Edell Aff., ¶ 4(d).

8. Budd Larner states, however, that a difference between *Cipollone* and this case is that, in this case, "costs will be exclusively borne by Budd Larner." Moving Brief at 6–7.

out-of-pocket costs and expended over $900,000 in attorney and paralegal time. Moving Brief at 9; *see also* Edell Aff., ¶ 7.

As a final cost consideration, Budd Larner argues that "much remains to be done to prepare *Haines* for trial." Moving Brief at 7. Budd Larner anticipates five motions will be filed on behalf of Haines [9] and eight motions will be filed by Defendants.[10] *Id.* at 7–8; Edell Aff., ¶¶ 8–10. Apparently, both Budd Larner and Defendants also plan to take additional discovery.[11] Moving Brief at 8–9; Edell Aff., ¶ 11.

In light of these anticipated expenses, Budd Larner concludes: "[I]t has become apparent that the amount of recovery against the tobacco industry is not likely to exceed these costs." Moving Brief at 1. To support this claim, Budd Larner points to the fact that, even when it received a verdict favorable to a plaintiff in *Cipollone*, that verdict was only for $400,000. *Id.* at 4, 6.

Apart from cost considerations, Budd Larner argues that considerations of public policy have already been achieved by its work in this case and that such considerations do not require Budd Larner to remain as Haines' counsel in this case. Budd Larner states:

> Even though the present case has not yet been tried, many believe that these cases have substantially achieved one of the main goals of product liability law—to provide the public, courts and legislators with the truth regarding a manufacturer's or an industry's practices. Budd Larner's efforts have been widely credited with obtaining in discovery what no other attorneys had been able to obtain.... These revelations regarding the tobacco industry's practices, and the ability of Congress and the public in general to benefit from Budd Larner's efforts, will be unaffected by whether Budd Larner remains as counsel in *Haines* or any other case. *Nor does the public have any overriding interest in*

9. According to the 2 Oct. 1992 Letter, the following motions will be filed on behalf of Haines: (1) Motion to limit the number of defense experts (twenty-six experts have been identified by Defendants); (2) Motion to strike defense expert witness' reports as "net opinions"; (3) Motion to produce non-Council for Tobacco Research ("CTR") and other R.J. Reynolds documents pursuant to the crime-fraud exception of the attorney client and work product privileges; (4) Motion for a hearing regarding renewal of "crime-fraud" challenge to CTR "Special Projects" documents; and (5) Motion for summary judgment on risk-utility design claim. 2 Oct. 1992 Letter at 11–12; Moving Brief at 7.

10. According to the 2 Oct. 1992 Letter, Defendants plan to file the following motions: (1) Motion to enforce order preventing Dr. Jeffrey Harris, Haines' expert, from testifying at trial; (2) Motion for summary judgment on post–1965 failure to warn claims; (3) Motion for summary judgment on Haines' claims of fraudulent misrepresentation, concealment, and conspiracy; (4) Motion for summary judgment on some part or all of Haines' risk utility design defect claim; (5) Motion for summary judgment on Haines' express warranty claims; (6) Motion to require Haines to specify statements by Defendants that she alleges constitute warranties or misrepresentations and the information Haines alleges Defendants intentionally concealed; (7) Motion to hold *in limine* hearings under *United States v. Downing*, 753 F.2d 1224 (3d Cir.1985), on the admissibility of opinions of certain of Haines' expert witnesses; and (8) Motions *in limine* with

respect to the admissibility of Haines' evidence generally. 2 Oct. 1992 Letter at 12; Moving Brief at 8.

11. Specifically, Defendants have indicated an intent to (1) take further depositions of Haines' expert, Dr. Harris, who has already been deposed for twenty-two days or, alternatively, of Haines' replacement expert, (2) take depositions on new or expanded theories of liability in light of *Cipollone v. Liggett Group, Inc.*, — U.S. —, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), (3) take additional depositions of fact witnesses, including Haines (who has already been deposed for three days) and Martha Rossi (Rossi's wife who has already been deposed for two days), (4) depose treating physicians and (5) serve contention interrogatories and/or requests for admission. Moving Brief at 8–9.

Haines has indicated an intent to take such additional discovery as (1) depositions of Defendants' experts, (2) depositions of previously identified corporate witnesses, (3) discovery of documents based upon the crime-fraud exception and depositions of fact witnesses relating to those documents, (4) depositions of corporate witnesses regarding CTR "Special Projects" documents if Haines is given access to such documents, (5) discovery of other documents which Defendants assert are privileged and (6) discovery of post–1965 advertising and marketing documents for True, Merit, Vantage and Kent brand cigarettes and depositions of fact witnesses with regard to those documents. *Id.* at 9.

*whether Haines or any other particular case proceeds to trial.*

Moving Brief at 10–11 (emphasis added) (citations omitted); *see also id.* at 18–19. In fact, Budd Larner argues that "there is a strong public interest in discontinuing lawsuits when the aggregate costs of the litigation far exceed the potential benefit to an individual plaintiff.... [T]here is a public interest in refraining from—or discontinuing—suits that have no economic viability." *Id.* at 19.

Budd Larner falls back upon its record of representation in the Cigarette Cases. For instance, Budd Larner quotes the Affidavit of Thomas Campion ("Campion"):

> The formidable work the Budd, Larner firm has done in the vigorous representations of its clients' interest in cigarette litigation is widely known among members of the trial bar in this state.... [Budd Larner] has acted with manifest devotion to the interests of its client and at an extraordinary financial sacrifice to its own interest.... I do not know of any firm in this state which has labored as vigorously or expended such sums of money to support the maintenance and continuation of litigation of this type. I do not know of many who could even afford to do so.

Moving Brief at 11; Campion Aff., ¶¶ 4–5. Budd Larner describes its own performance as follows:

> For many years Budd Larner sought to vindicate its clients' position: it acted tenaciously and aggressively in an effort to prove that the cigarette companies should not have induced people to smoke and that they have failed to provide adequate warnings of smoking risks. Regrettably, the

impending financial burden is now far too great for Budd Larner to bear.

Moving Brief at 1. Budd Larner suggests that "[i]f there is any substantial public interest in the continuation of this litigation, a public spirited organization or law firm is free to underwrite it or take it on."[12] *Id.* at 19. Thus, "[u]pon withdrawal of Budd Larner, plaintiff can be given a reasonable time to find new counsel and new counsel can be given a reasonable time to prepare." *Id.* at 22.

### B. *Arguments By Haines Against Withdrawal*

Haines begins by re-formulating the issue presented by this motion. She states:

> Presently before the Court is Budd Larner's motion for leave to withdraw as counsel for plaintiff in the above matter.

> The central theme of Budd Larner's pleading, as well as every one of the affidavits submitted in support of its motion, is money; nothing more, nothing less.

> The issue which *should* be addressed by the Court is not whether a comparison of projected legal expenses against potential recovery makes it ethical or permissible for Budd Larner to withdraw. Rather, the issue is whether this Court should permit the *[D]efendants* in this case to engage in pre-trial and trial conduct which generates such an imbalance.

> As long as any Court is willing to sit back and merely watch as the parties in tobacco litigation engage in a battle of attrition, the plaintiff will always run out of ammunition before the [D]efendants even

---

**12.** Despite this suggestion, Budd Larner recognizes that finding a replacement law firm may be difficult. It states:

> Budd Larner has already approached Richard Daynard, the Chairman of the Tobacco Products Liability Project in Boston—a clearinghouse for all lawyers prosecuting smoking and health litigation throughout the country. As of November 12, 1992, Mr. Daynard was unable to identify anyone who was willing to undertake the representation of plaintiff in this case—even though Budd Larner has indicated a willingness to forego reimbursement of its expenses.

Moving Brief at 19; *see also* Edell Aff., ¶ 13.

In its Reply Brief, Budd Larner indicates that a recent "overture has been made by an out-of-state law firm to defray some of the expenses of this lawsuit and to provide some legal support to Budd Larner." Reply Brief at 2 n. 1. Nevertheless, Budd Larner states: "This overture contemplates Budd Larner preparing and trying the case. It is therefore unacceptable to us because it would not eliminate the unreasonable financial burden." *Id.*

begin to notice a diminution of their resources.

Opp. Brief at 1 (emphasis in original).

Haines discusses what she describes as "the Tobacco Industry Strategy" to defend against cigarette liability suits. *Id.* at 2. According to Haines, the "tobacco industry has taken the position that its members will never settle a lawsuit which involves claims that tobacco has caused injuries to an individual."[13] *Id.* Moreover, she states, "the ability to outspend and over-litigate is ... used to persuade those attorneys and their clients who were 'foolish' enough to file suit to voluntarily dismiss their claims."[14] *Id.* at 1.

To support her argument, Haines cites, *inter alia,* the following statement by J. Michael Jordan ("Jordan"), counsel for RJR, in which Jordan discusses the voluntary dismissal of nine cigarette cases in California:[15]

> [T]he aggressive posture we have taken regarding depositions and discovery in general continues to make these cases extremely burdensome and expensive for plaintiffs' lawyers, particularly sole practitioners. To paraphrase General Patton, the way we won these cases was not by spending all of [RJR]'s money, but by making that other son of a bitch spend all of his.

*Id.* at 8 (citing Memorandum from Jordan to unspecified Smoking and Health Attorneys, dated 29 April 1988) (submitted as Exhibit A to Edell Aff.).

Haines recognizes that she "does not want this Court to force Budd Larner to spend hundreds of thousands of dollars in a vain effort to match [D]efendants' ability to spend." *Id.* at 10. Instead, Haines argues that "this Court should take firm control of the litigation to ensure ... that 'magnitude of the impact of the disparity in resources between these parties, plus the sophisticated and calculated exploitation of the situation by the [D]efendants, do not approach a denial of due process." *Id.* (quoting *Thayer,* 1.2 T.P.L.R. at 2.81. According to Haines:

> If this Court is willing to take the necessary steps to ensure that the disparity of resources is not the ultimate arbiter of

---

**13.** One Defendant has conceded as much. As Murray Bring, Vice President and General Counsel of Phillip Morris, stated in 1988: "Almost 200 lawsuits have been brought in the last five and a half years and the cigarette manufacturers have not ... paid a penny to settle one." *Phillip Morris Magazine* 29 (Summer 1988) (attached as Exhibit C to Edell Aff.).

**14.** According to Haines:

> Budd Larner's motion for leave to withdraw is a perfect example of the success of [D]efendants' strategy. After ten years of protracted litigation and an expenditure of approximately $6.2 million dollars, not one of the tobacco cases filed by Budd Larner or its co-counsel have been ultimately resolved on the merits.

Opp. Brief at 1–2.

> Budd Larner agrees with Haines' characterization of Defendants' litigation strategy. It states: Much of the extraordinary expenditure of money and time in these cases is directly attributable to the cigarette industry's clearly articulated and effectively executed defense strategy: resisting discovery, appealing every adverse decision and avoiding settlement. In short, the industry does everything it can to cause plaintiffs' attorneys to spend a great deal of money.

Moving Brief at 5; Edell Aff., ¶ 5.

**15.** Haines also cites two cases, *Thayer v. Liggett & Myers Tobacco Co,* 1.2 T.P.L.R. 2.63

(W.D.Mich.1970) and *Pritchard v. Liggett & Myers Tobacco Co.,* 134 F.Supp. 829 (W.D.Pa. 1955). *Thayer,* a case voluntarily dismissed by the plaintiff after years of litigation, contains an extensive discussion of the motion and discovery practice of defendant Liggett & Myers. *Thayer,* 1.2 T.P.L.R. at 2.64–2.81; *see also* Opp. Brief, Ex. A (attaching copy of *Thayer* opinion). *Pritchard,* filed in 1954, appears to have been dismissed thirteen years later in 1967, after two trials, two appeals to the Third Circuit and two petitions for certiorari. Opp. Brief at 5–7; *see also Pritchard v. Liggett & Myers Tobacco Co.,* 370 F.2d 95 (3d Cir.1966), *cert. denied,* 386 U.S. 1009, 87 S.Ct. 1350, 18 L.Ed.2d 436 (1967); *Pritchard v. Liggett & Myers Tobacco Co.,* 350 F.2d 479 (3d Cir.1965), *cert. denied,* 382 U.S. 987, 86 S.Ct. 549, 15 L.Ed.2d 475 (1966); *Pritchard v. Liggett & Myers Tobacco Co.,* 295 F.2d 292 (3d Cir.1961); *Pritchard,* 134 F.Supp. 829.

Haines also cites *Cipollone* and the other Cigarette Cases as examples of Defendants' alleged litigation strategy. Haines points out that, in *Cipollone,* over one hundred motions, four interlocutory appeals, one final appeal and two petitions for certiorari were filed, and plaintiff's expert witness, Dr. Harris, was deposed for twenty-two days and testified at trial for nine days. Moreover, in the Cigarette Cases generally, Defendants have taken two hundred twenty-two days of fact-witness depositions and seventy days of expert witness depositions.

truth, this case can be prepared, tried and disposed of in an orderly, expeditious and fair manner without the necessity of bankrupting Budd, Larner and without prejudice to [D]efendants. Rule 1 of the Federal Rules of Civil Procedure calls for nothing less.

Opp. Brief at 2. Haines then suggests numerous ways for the court to decrease the expense and timeliness of the litigation—most notably, by limiting Defendants' discovery and use of expert witnesses [16] pursuant to Fed.R.Civ.P. 1,[17] 26 [18] and 83.[19] *Id.* at 10–12.

### C. *Standard of Review*

Rule 6 of the General Rules of District Court for the District of New Jersey (the "Local Rules") provides that members of the bar permitted to practice in this court are governed by the Rules of Professional Conduct of the American Bar Association (the "ABA"), as those rules have been revised by the Supreme Court of New Jersey,[20] and subject to "such modifications as may be required or permitted by [F]ederal statute, regulation, court rule or decision at law." *See* Local Rule 6(A). In other words, "the ethical rules and constraints imposed on [F]ederal practitioners in New Jersey are the same as those imposed on New Jersey attorneys generally by the state Supreme Court under New Jersey Court Rule 1:14." [21] Comment, Local Rule 6.

New Jersey Rule of Professional Conduct 1.16 ("RPC 1.16"), entitled "Declining or Terminating Representation," is the state ethical rule which governs this motion. RPC 1.16 states in pertinent part:

A lawyer may withdraw from representing a client if withdrawal can be accomplished without material adverse effect on the interests of the client, *or if* ... (5) the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client.

RPC 1.16(b) (emphasis added). Based on this language, RPC 1.16 has been interpreted by some commentators as providing for withdrawal under two circumstances: (1) for any reason, so long as no material adverse effect on the client occurs and (2) for good cause, such as financial hardship, even if withdrawal has a material adverse effect on the client. S. Gillers & N. Dorsen, *Regulation of Lawyers: Problems of Law and Ethics* 432 (1989).

■ Even with these provisions, RPC 1.16 provides that withdrawal is entirely within the discretion of the court and a court may refuse to allow withdrawal despite a showing of good cause. RPC 1.16(c); *see also United States v. Cannistraro*, 799 F.Supp. 410, 419 (D.N.J.1992), *appeal filed* 10 August 1992; *Streetman v. Lynaugh*, 674 F.Supp. 229, 234

---

**16.** For instance, given Dr. Harris twenty-two days of deposition testimony and nine days of trial testimony, Haines suggests that re-deposition is not necessary. Opp. Brief at 8. Similarly, Haines questions the necessity of the twenty-six expert depositions which Defendants suggest taking. *Id.* at 9.

**17.** Rule 1 provides that the Federal Rules of Civil Procedure "shall be construed to secure the just, speedy, and *inexpensive* determination of every action." Fed.R.Civ.P. 1 (emphasis added).

**18.** Rule 26 provides in pertinent part:

The frequency or extent of use of ... discovery ... shall be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome or *less expensive;* (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the discov-

ery is *unduly* burdensome or *expensive*, taking into account the needs of the case, the amount in controversy, *limitations on the parties' resources*, and the importance of the issues at stake in the litigation.

Fed.R.Civ.P. 26(b)(1) (emphasis added).

**19.** Rule 83 provides in pertinent part: "[D]istrict Judges ... may regulate their practice in any manner not inconsistent with these rules or those of the district in which they act." Fed.R.Civ.P. 83.

**20.** On 12 July 1984, the New Jersey Supreme Court adopted an amended version of the ABA's Rules of Professional Conduct. *See* Comment, Local Rule 6.

**21.** New Jersey Court Rule 1:14 provides: "The Rules of Professional Conduct ..., as amended and supplemented by the [New Jersey] Supreme Court ..., shall govern the conduct of members of the bar ... of this state." *Id.*

(E.D.Tex.1987); *Jacobs v. Pendel*, 98 N.J.Super. 252, 255, 236 A.2d 888 (App.Div.1967). Specifically, the Rule states: "[A] lawyer shall continue representation *notwithstanding good cause* for terminating the representation" when so ordered by the court. RPC 1.16(c). The theory behind this provision is that, even if withdrawal is otherwise appropriate, other considerations must sometimes take precedence, such as maintaining fairness to litigants and preserving a court's resources and efficiency. G. Hazard & W. Hodes, 1 *The Law of Lawyering*, § 1.16:401 at 483 (1990); *see also Jacobs*, 98 N.J.Super at 255, 236 A.2d 888 (withdrawal "depends upon such considerations as proximity of the trial and possibility for the client to obtain other representation").

Federal law does not expressly permit withdrawal by an attorney on the ground of financial hardship. Instead, Local Rule 18 provides that court permission is required before an attorney may withdraw from representation. Local Rule 18 states: "Unless counsel is substituted, no attorney may withdraw an appearance except by leave of Court. After a case has been first set for trial, substitution and withdrawal shall not be permitted except by leave of Court." *Id.*

■ The comment to Local Rule 18 indicates that consideration of four criteria is appropriate for motions to withdraw: (1) the reasons why withdrawal is sought, (2) the prejudice withdrawal may cause to litigants, (3) the harm withdrawal might cause to the administration of justice and (4) the degree to which withdrawal will delay resolution of the case. Comment, Local Rule 18 (citing *Avant–Garde Computing Inc. Secur. Litigation*, No. 85–4149, *slip op.*, 1989 WL 103625 (D.N.J. 31 Aug. 1989)). These criteria are consistent with the provisions of RPC 1.16.

## 1. *Good Cause For Withdrawal*

■ Budd Larner argues that it should be permitted to withdraw because it can no longer afford to maintain this action against Defendants and, therefore, by demonstrating financial hardship, it has demonstrated good cause for withdrawal. Moving Brief at 1–2, 15–18. The issue, however, is not so simple.[22]

Although there is no debating that the Cigarette Cases have cost Budd Larner a significant amount of money, this expense represents the aggregate expense to Budd Larner of *all* eight Cigarette Cases. As mentioned, Budd Larner has not stated how much money it has spent on this particular litigation. Haines should not lose her representation because Budd Larner has incurred significant expenses in other—similar but separate—matters.

Equally difficult to accept is Budd Larner's suggestion that *Cipollone* should be used as a yardstick for the determination of potential costs in this case. Moving Brief at 6–9; Edell Aff., ¶ 6. This case is not *Cipollone*. Whatever may have occurred in *Cipollone*, that case was not before this court. To the extent Jordan's paraphrase of General Patton correctly reflects the attitude of Defendants,[23] it is at odds with the purposes of the Federal Rules of Civil Procedure and is intolerable. The design of the Federal Rules, to ensure the "just, speedy, and *inexpensive* determination" of this action or any matter, Fed.R.Civ.P. 1 (emphasis added), cannot be ignored. It must be recognized:

> Delay and excessive expense now characterize a large percentage of all civil litigation. The problems arise in significant part, as every judge and litigator knows, from abuse of the discovery procedures available under the Rules.... We may assume that discovery usually is conducted

---

**22.** The paucity of case law on this question is noteworthy. Budd Larner cites only one case, *In re "Agent Orange" Product Liability Litigation*, 571 F.Supp. 481 (E.D.N.Y.1983), in which a law firm was allowed to withdraw for reason of financial hardship. As discussed below, *see infra* at n. 27, *Agent Orange* is inapplicable.

**23.** Again, Jordan's statement is as follows:
> [T]he aggressive posture we have taken regarding depositions and discovery in general continues to make these cases extremely burdensome and expensive for plaintiffs' lawyers, particularly sole practitioners. To paraphrase General Patton, the way we won these cases was not by spending all of [RJR]'s money, but by making that other son of a bitch spend all of his.

Opp. Brief at 8; *see also* Edell Aff., Ex. A.

in good faith. Yet all too often, discovery practices enable the party with greater financial resources to prevail by exhausting the resources of the weaker opponent. The mere threat of delay or unbearable expense denies justice to many actual or prospective litigants.... Litigation costs have become intolerable, and they cast a threatening shadow over the basic fairness of our legal system.

Order Amending Federal Rules of Civil Procedure, 446 U.S. 997, 1000 (1980) (Stewart, J., dissenting); *see also* Fed.R.Civ.P. 26(b) Advisory Committee Note (noting that Rule 26(b) should be used to "prevent use of discovery to wage a war of attrition or as a device to coerce a party, whether financially weak or affluent").

As Budd Larner recognizes, its noteworthy accomplishments in the Cigarette Cases generally, as well as the decisions rendered by the Third Circuit and the Supreme Court in *Cipollone, see* 893 F.2d 541 (3d Cir. 1990); — U.S. —, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), set this case in a different procedural posture than *Cipollone.* Because of *Cipollone* and the other Cigarette Cases, much of the groundwork for trial of this case has already been set in place. Prior discovery, in the form of both documents and deposition testimony, can provide the parties with ready data which will decrease the amount of discovery necessary in this case. In addition, as a result of the holdings in *Cipollone,* the legal issues in this case have been narrowed and clarified; the parties are better able to focus their discovery requests.

In sum, while Budd Larner has demonstrated that it has expended a significant amount of resources in litigating the Cigarette Cases generally,[24] it has not demonstrated a sufficient basis to permit withdrawal absent the consent of Haines.[25]

**24.** Of course, now that at least six of the eight Cigarette Cases have been dismissed or have allowed Budd Larner to withdraw, Budd Larner's prospective overall financial burden will be decreased.

**25.** Budd Larner's motion is also based on the fact that, in *Cipollone,* the jury returned a verdict for only $400,000. *See* Moving Brief at 6. This argument too is not persuasive. There simply is no way to predict the verdict which a jury in this

2. *Additional Bases For Denying Withdrawal* [26]

a. Inability to Find Substitute Counsel

■ Contrary to the assertions of Budd Larner and their expert, Fred S. McChesney ("McChesney"), this motion for withdrawal implicates concerns other than money. *See* McChesney Aff., 3–8. At stake is the ability of citizens to bring and maintain suits for the purpose of vindicating rights and receiving compensation for injuries, as well the ability of clients to rely upon the representation of and the agreements with their attorneys.

■ When an attorney agrees to undertake the representation of a client, he or she is under an obligation to see the work through to completion. *Streetman,* 674 F.Supp. at 234; *United States v. Ramey,* 559 F.Supp. 60, 62 (E.D.Tenn.1981); *see also Smith v. Anderson–Tulley Co.,* 608 F.Supp. 1143, 1146 (S.D.Miss.1985) (obligation of attorney to client "is one of the paramount obligations undertaken in the attorney-client relationship"), *aff'd,* 846 F.2d 751 (5th Cir. 1988). This obligation is not disposed of easily. As the court stated in *Kriegsman v. Kriegsman,* 150 N.J.Super 474, 375 A.2d 1253 (App.Div.1977):

An attorney has certain obligations and duties to a client once representation is undertaken. These obligations do not evaporate because the case becomes more complicated or the work more arduous or the retainer not as profitable as first contemplated or imagined. Attorneys must never lose sight of the fact that the profession is a branch of the administration of justice and not a mere money-getting trade.... The lawyer should not throw up the unfinished task to the detriment of his client....

*Id.* at 480, 375 A.2d 1253 (citations omitted); *accord In re Edsall,* 89 B.R. 772, 775 (Bankr.

case might render; Budd Larner has not presented any reason why a verdict in favor of Haines would be limited by the amount rendered in *Cipollone.*

**26.** Even if it is assumed that Budd Larner has demonstrated good cause for withdrawal from representation of Haines, which it has not, withdrawal in this case would not be appropriate for the reasons which follow.

N.D.Ind.1988); *In re Pair,* 77 B.R. 976, 979 (Bankr.N.D.Ga.1987).

In cases when withdrawal would significantly impair a client's ability to find substitute counsel or to maintain the action, courts have refused to permit withdrawal despite the fact that representation has become unprofitable for the client's lawyers.[27] *See, e.g., Kriegsman,* 150 N.J.Super. at 479–80, 375 A.2d 1253; *Edsall,* 89 B.R. at 775–76; *Pair,* 77 B.R. at 979. Such is the case here. If Budd Larner is permitted to withdraw from this case, it is unlikely that Haines will be able to find counsel to take Budd Larner's place. As Budd Larner concedes:

> Budd Larner has already approached Richard Daynard, the Chairman of the Tobacco Products Liability Project in Boston—a clearinghouse for all lawyers prosecuting smoking and health litigation throughout the country. As of November 12, 1992, Mr. Daynard was unable to identify anyone who was willing to undertake the representation of plaintiff in this case—even though Budd Larner has indicated a willingness to forego reimbursement of its expenses.

Moving Brief at 19; *see also* Edell Aff., ¶ 13. As of the date of Budd Larner's Reply Brief, 8 January 1993, it appears that substitute counsel is not available. *See* Reply Brief at 1–2. As well, even if substitute counsel were available, the consent of Haines to such substitution is necessary.

Even if Haines could procure substitute counsel, serious questions are raised as to whether such a transition could be effected without causing severe prejudice to Haines' interests. Put simply, Budd Larner is recognized as the leading law firm in the field of

tobacco products liability litigation. *See Trial Lawyers Doing Public Justice* 10 (July 1988); Gidmark, "Anatomy of a Landmark: Marc Edell and *Cipollone v. Liggett Group,*" 12 *Trial Diplomacy Journal* at 8. Due to their experience acquired in ten years of litigation against these same Defendants, particularly in *Cipollone* and *Dewey,* Budd Larner is uniquely aware of the facts, documents, expert testimony, litigation strategy, legal issues and legal authority which are necessary for effective representation in this case, given the complex legal and factual issues which it presents. *See Streetman,* 674 F.Supp. at 235; *see also Ross v. Warthen,* No. 84 Civ. 4009, 1987 WL 7025 *4 (S.D.N.Y. 17 Feb. 1987) (attorney's "degree of familiarity with relevant facts and expertise in the relevant law ... gained by way of appearing in these actions is relevant to any consideration of [client] hardship").

To allow withdrawal under these circumstances would be inappropriate. When an attorney undertakes to represent a client, he or she has an obligation to fully protect his or her client's interests.[28] *Broder Credit & Collection SVC. v. Burton,* 193 N.J.Super. 474, 480, 475 A.2d 52 (App.Div.1984). Indeed, RPC 1.16 stresses client protection by requiring that steps be taken to minimize the harm done to a client upon withdrawal. *See* RPC 1.16(d); *see also* G. Hazard & W. Hodes, *Law of Lawyering,* § 1.16:101 at 466. Given the inability of Haines to find any substitute counsel at all, let alone effective substitute counsel, it appears nothing can be done to protect her interests or minimize the harm of withdrawal. Without counsel, as Haines indicates, *see* Opp. Brief at 14, this action will not go forward.

---

**27.** For this reason, *Agent Orange,* 571 F.Supp. 481, is distinguishable. Although Budd Larner cites this case (and only this case) as an instance in which a law firm was allowed to withdraw for reasons of financial hardship, replacement counsel was available and ready and willing in *Agent Orange. See id.* at 482–83. Moreover, *Agent Orange* was a class action where the private relationship with an attorney, as contracted for by Haines and developed by Budd Larner, was absent. To permit substitution or withdrawal in a situation such as this case, the threshold question is whether plaintiff consents.

**28.** This obligation to protect a client's interest is part of the fiduciary duty which a lawyer owes to

his or her client. *Albright v. Burns,* 206 N.J.Super. 625, 632, 503 A.2d 386 (App.Div.1986); *Procanik v. Cillo,* 206 N.J.Super. 270, 281, 502 A.2d 94 (Law.Div.1985), *rev'd on other grounds,* 226 N.J.Super. 132, 543 A.2d 985 (App.Div.), *cert. denied,* 113 N.J. 357, 550 A.2d 466 (1988). As one court has stated:

> There are few of the business relations of life involving a higher trust and confidence than that of the attorney and client ... few more anxiously guarded by the law, or governed by sterner principles of morality and justice.

*In re Loring,* 73 N.J. 282, 290, 374 A.2d 466 (1977) (quoting *Stockton v. Ford,* 52 U.S. (11 How.) 232, 247, 13 L.Ed. 676 (1850)).

Haines has relied upon the representation of Budd Larner and its concomitant duty to pursue her cause both diligently and to its completion. *In re Yetman*, 113 N.J. 556, 562, 552 A.2d 121 (1989); *In re Smith*, 101 N.J. 568, 571–72, 503 A.2d 846 (1986); *In re Schwartz*, 99 N.J. 510, 518, 493 A.2d 1248 (1985). If Budd Larner's withdrawal were permitted, with the result that this action would not be litigated, the reliance and trust of Haines would be undermined. This result cannot be permitted.[29] *See Loring*, 73 N.J. at 289–90, 374 A.2d 466 (court must "be watchful and industrious to see that the confidence reposed [in an attorney] shall not be used to the detriment or prejudice of the rights of the [client]") (quoting *Stockton*, 52 U.S. at 247, 13 L.Ed. 676).

b. Contingency Fee Contract

▆ Also significant to the question of withdrawal is the fact that Budd Larner's representation is premised upon a contingency fee arrangement. At the core of such an arrangement is "a contract between an attorney and client setting the formula for calculating the attorney's fee" in exchange for representation. *Iskander v. Columbia Cement Co.*, 197 N.J.Super 169, 174, 484 A.2d 353 (App.Div.1984). This contract is binding. A "client may not disavow the formula after settlement on the thesis that the settlement was easier than average or quicker than anticipated." *Id.* at 174, 484 A.2d 353. The opposite of this principle is applicable here; an attorney must abide by the terms of the contract as well, particularly in this case in which withdrawal is sought because of (1) expenses incurred in other matters and (2) anticipated expenses that have not yet been incurred. *See supra* at pp. 423–424. *Cf. In re Meyers*, 120 B.R. 751, 753 (Bankr.S.D.N.Y. 1990) (in absence of express provision for withdrawal of counsel, proper construction of fee agreement was that representation was to continue). Simply put, Budd Larner is ill at ease because the contract it made may not be lucrative, as it hoped at the time the contingency fee agreement was formed.

Case law cited by Budd Larner on this point is not persuasive. Budd Larner cites cases in which withdrawal was permitted because a client failed to pay required legal fees and expenses. *See Securities and Exchange Comm'n v. Kimmes*, No. 89–5942, 1991 WL 256868 (N.D.Ill. 8 Nov. 1991); *Max–Um Fin. Holding Corp. v. Moya Overview, Inc.*, No. 88–6345, 1990 WL 136380 (E.D.Pa. 19 Sept. 1990). These cases are not relevant because Haines has done nothing to justify withdrawal by Budd Larner. As Budd Larner recognizes, Haines is under no obligation for fees and expenses until and unless there is recovery in the case. *See* Moving Brief at 17 ("Budd Larner has received no fees at all and no reimbursement.... This is through no fault of the client ... [as] the parties agreed that Budd Larner would be reimbursed only if a judgment were obtained").

---

29. Budd Larner argues that "there is a public interest in refraining from—or discontinuing—suits that have no economic viability." Moving Brief at 19. This statement is questionable. There is a high public interest in cases such as this, regardless of their profitability. For instance, according to Budd Larner, *Cipollone* was not profitable. Yet, as Bud Larner concedes:

> Documents damaging to the tobacco industry have been produced for the first time in discovery as a result of Budd Larner's tenacity; the discovery documents made public during *Cipollone* have led to Congressional calls for an investigation of the tobacco industry; at least one Congressman has introduced a bill to remove any protection the tobacco industry enjoys as a result of preemption under the Cigarette Labelling Act; and legal issues, such as the preemptive effect of the Cigarette Labelling Act, have been resolved.

Moving Brief at 19. If Budd Larner had been allowed to withdraw at the point in *Cipollone* which it now seeks to withdraw in this case, it is questionable whether these gains would have occurred.

In addition, contrary to Budd Larner's suggestion, from a plaintiff's perspective, there is still much to achieve. The question of whether tobacco companies can be held liable for their products—a question still not resolved—profoundly impacts upon the public interest. *See Trial Lawyers* at 6 ("[a]ccording to the Surgeon General, cigarettes are responsible for over 300,000 deaths annually in the United States"). This interest has been intensified by the recent report of the Environmental Protection Agency on the effects of "second-hand" smoking, which indicates that second-hand smoke is responsible for 3,000 deaths annually and 20 percent of lung cancer cases. *See* Fagin, "Cancer Risk; EPA Concludes Secondhand Smoke Kills Thousands," *Newsweek* 7 (8 Jan. 1993).

Budd Larner also argues that, if this were a contract case not involving legal representation, the agreement between Haines and the firm would be void on the ground of unilateral or mutual mistake. *Id.* Budd Larner states:

> [T]he costs of litigating against the tobacco industry are far greater than anyone could have reasonably expected at the time the contingency contract was signed. Budd Larner has expended more money and effort in this case than any plaintiff could reasonably expect. If this situation had arisen outside the attorney-client context, the contract could be rescinded because of unilateral or mutual mistake.

*Id.* (citing *Hamel v. Allstate Ins. Co.,* 233 N.J.Super 502, 507, 559 A.2d 455 (App.Div. 1989); *Lampley v. Davis Mach. Corp.,* 219 N.J.Super 540, 549–50, 530 A.2d 1254 (App. Div.1987)).

This argument is not compelling in the context of a contingency fee relationship which, by its nature, involves uncertainty and risk and requires the parties to make predictions as to (1) the likelihood of recovery, (2) the length of time until recovery and (3) the probable size of recovery. S. Gillers & N. Dorsen, *Regulation of Lawyers* at 114–15. Given their litigation experience, lawyers are in a better position than clients to make these predictions. *Id.*

The element of risk, moreover, is an element of contingency fee arrangements. For this reason, "it is generally accepted that a lawyer may receive a contingent fee that would be unconscionably high if it were a guaranteed fee." *Id.* at 115; *see also McKenzie Construction, Inc. v. Maynard,* 823 F.2d 43 (3d Cir.1987) (finding contingency fee that yields $790 per hour not unreasonable although thirteen times the lawyer's usual hourly rate). The argument cannot work both ways; accepting high fees when the risk of litigation pays off and claiming unilateral mistake when the decision and investment go bad are unacceptable.

Having contracted with Haines on a contingency fee basis, Budd Larner cannot now walk away from the contract because the case may not generate the return it expected at the outset—either by judgment and/or additional clients. Contrary to Budd Larner's suggestion, profitably is not a "basic assumption" of a contingency fee contract. Moving Brief at 17. Although Budd Larner entered this contract with Haines because it believed the contract would be profitable, it also knew that in litigation—particularly litigation in which a law firm advances costs and forgoes fees until an expected judgment—there are uncertainties.[30] As with all contingency fee arrangements, Budd Larner knowingly assumed the risk that its arrangement with Haines would not match its initial prediction of costs and returns. It is simply disingenuous to suggest that unilateral or bilateral mistake can be applied in such a context on the ground that cost has exceeded initial predictions.

Finally, important public policy considerations which underlie contingent fee arrangements would be ill-served by permitting withdrawal in this case. Contingency fees are "a necessary means of broadening access to justice, allowing those otherwise unable to afford counsel to obtain representation in the courts." G. Hazard & S. Koniak, *The Law and Ethics of Lawyering* 503 (1990); *see also Leonard C. Arnold, Ltd v. Northern Trust Co.,* 116 Ill.2d 157, 164, 107 Ill.Dec. 224, 226, 506 N.E.2d 1279, 1281 (1987) (describing contingency fee arrangements as "the poor man's door to the courthouse"); *In re Schwartz,* 141 Ariz. 266, 686 P.2d 1236, 1242 (1984) (same). As the New Jersey Supreme Court has recognized: "Legal service to the poor is frequently available only through the contingent fee device." *American Trial Lawyers Ass'n v. New Jersey Supreme Court,* 66 N.J. 258, 260 n. 4, 330 A.2d 350 (1974).

If lawyers—after assessing the likelihood of recovery, negotiating a contingency fee

---

**30.** In 1988, *Time* magazine reported that, "[o]f the more than 300 lawsuits filed against tobacco companies since 1954, [*Cipollone*] was the first in which the defendant was at least partly liable or ordered to pay damages." Koepp, "Tobacco's First Loss," *Time* 48 (27 June 1988); *accord* Shipp, "After the Smoke Has Cleared, Both Sides Declare a Victory," *N.Y. Times* (15 June 1988). It would appear that, in entering this contingency agreement with Haines, Budd Larner was well aware, or should have been aware, that recovery was by no means certain.

and raising the expectations of their client—are permitted to withdraw when contingency fee representation becomes unprofitable or even costly, the purpose of contingency fee litigation will be defeated. Access to justice will not be broadened; it will be constricted. Moreover, as in this case, the contingency fee arrangement will actually have made matters worse.

When a lawyer is permitted to withdraw on the ground that maintaining the litigation has become too costly, finding substitute counsel may well prove to be difficult or even impossible. Individual claims, as well as entire classes of claims, may be stigmatized. As for plaintiffs, the disappointment at having been abandoned mid-stream is likely to undermine faith in the legal system and to reinforce the notion that access to the courthouse is a function of wealth. Simply put, the needs and obligations of the contingency fee system dictate that Budd Larner not be permitted to close the door to the courts which it has opened.[31] To permit withdrawal would be to permit the nullification of any contingency fee contract which later turns out to be less profitable than originally thought.

## CONCLUSION

For the reasons set forth above, the motion of Budd Larner to withdraw is denied.

---

**31.** Budd Larner and McChesney argue that denial of the motion would be "contrary to the public policies that the contingency fee system is intended to serve." Reply Brief at 2. McChesney explains:

> An attorney, knowing that later withdrawal would not be allowed no matter how extreme his financial burden, will naturally be more reluctant to accept claims like those in the tobacco litigation, where the facts were unclear and the law itself was uncertain and evolving. The ultimate losers in a system where withdrawal from cases of insufficient value is not permitted are thus future plaintiff-victims who will most need attorneys....

McChesney Aff., ¶ 14.

This argument is unpersuasive. First, as the arguments discussed above indicate, denial of the motion is (1) appropriate because of the contingency fee contract and (2) necessary to support the public policies which underlie the contingency fee system. *See supra* at pp. 426–428. Second, lawyers will not be deterred from accepting contingency fee cases because of the compensation which results from such arrangements. That Budd Larner chose to take on the Cigarette Cases when, out of 300 cases since the 1950s, *no* case against the tobacco companies had resulted in a judgment for plaintiffs, supports this proposition. *See* Gidmark, "Anatomy of a Landmark: Marc Edell and *Cipollone v. Liggett Group*, 12 *Trial Diplomacy Journal* 6, 8 (Spring 1989). Third, the idea that attorneys should be able to unilaterally avoid contingency fee contracts because they have become too expensive to maintain, while relying plaintiffs are left with stigmatized claims and no representation, is simply untenable.