267 N.J. Super. 62 (1993)
630 A.2d 820
DORIS SMITH AND LEROY SMITH, PLAINTIFFS-APPELLANTS,
v.
R.J. REYNOLDS TOBACCO COMPANY AND THE AMERICAN TOBACCO COMPANY, DEFENDANTS. BUDD LARNER GROSS ROSENBAUM GREENBERG & SADE, P.C., AND WILENTZ, GOLDMAN & SPITZER, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted June 16, 1993.
Decided August 9, 1993.
*63 Before Judges HAVEY, STERN and BROCHIN.
Nancy M. Viso, pro se, submitted a letter brief and reply brief on behalf of appellants.
Riker, Danzig, Scherer, Hyland & Perretti, attorneys for defendant-intervenor R.J. Reynolds Tobacco Company (Jones, Day, Reavis & Pogue, of counsel; Alan E. Kraus on the brief).
*64 Kenney & Kearney, attorneys for defendant-intervenor The American Tobacco Company (Chadbourne & Parke, of counsel; Joseph H. Kenney on the brief).
Budd Larner Gross Rosenbaum Greenberg & Sade, and Wilentz, Goldman and Spitzer, attorneys for respondents, pro se (Donald P. Jacobs on the brief).
The opinion of the court was delivered by STERN, J.A.D.
This appeal requires us to consider, for the first time, the standards for permitting an attorney to withdraw, for "an unreasonable financial burden," from litigation commenced under a contingency agreement.
In the spring of 1983, the law firms of Budd Larner Gross Rosenbaum Greenberg and Sade, P.C. (Budd Larner), Wilentz, Goldman and Spitzer (Wilentz), and Porzio, Bromberg and Newman (Porzio) entered into an agreement whereby the three firms were to jointly prosecute actions against cigarette manufacturers and members of the tobacco manufacturing institute on behalf of smokers who allegedly developed lung cancer as a consequence of smoking cigarettes. The firms thereafter entered into contingency fee retainer agreements with their respective clients to prosecute eight lawsuits, including Cipollone v. Liggett Group, Inc. and the case which forms the basis of this appeal.
The agreement between the three firms continued until 1986, when Marc Z. Edell left Porzio and joined the Budd Larner firm. Subsequently, Budd Larner and Wilentz jointly prosecuted all but one of the cases. That case was prosecuted by Budd Larner alone.[1]
*65 The complaint in this case was filed in September 1984. The case was initially removed to federal court but was remanded to the Law Division in December 1986. Thereafter relatively little of substance related to the peculiar facts of this case occurred, initially because of stays entered pending litigation concerning the ability of the Wilentz firm to remain in the various cases. See Dewey v. R.J. Reynolds Tobacco Co., 109 N.J. 201, 536 A.2d 243 (1988) (Dewey I).
On January 3, 1989, almost a year following the decision of our Supreme Court in Dewey I, a consent order was entered which stayed all proceedings in the three State court cigarette cases pending appellate consideration of issues relating to pre-emption of state law claims by various federal statutes and the impact of our new Products Liability Law, N.J.S.A. 2A:58C-1 to -7. See Dewey v. Brown & Williamson Tobacco, 225 N.J. Super. 375, 542 A.2d 919 (App.Div. 1988), aff'd in part and rev'd in part, sub nom. Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 577 A.2d 1239 (1990) (Dewey II). In the interim, additional disqualification applications were being heard following the Dewey I decision, and the consent order was thereafter extended on October 5, 1989, "pending determination of the disqualification issue at which time the court will hear further arguments regarding whether the stay should continue."
On August 9, 1990, the trial judge (to whom the matter was assigned for all purposes) denied defendants' motion to disqualify Wilentz as counsel in this and two other cases including Barnes v. R.J. Reynolds Tobacco Co. The order also continued the stay of the proceedings but allowed for a de bene esse deposition to preserve the testimony of plaintiff Doris Smith. Ms. Smith, however, died on August 31, 1990, before her testimony was taken.
We granted leave to appeal the order which allowed the Wilentz firm to represent the Smiths and other plaintiffs, and affirmed the decision on March 7, 1991. Barnes v. R.J. Reynolds Tobacco Co., *66 246 N.J. Super. 348, 587 A.2d 667 (App.Div. 1991).[2]
Because the United States Supreme Court had granted certiorari in one of the related cases, see Cipollone v. Liggett Group, Inc., 499 U.S. 935, 111 S.Ct. 1386, 113 L.Ed.2d 443 (1991), the trial judge subsequently decided to continue the stay until that Court rendered its controlling decision relating to the viability and pre-emption of the similar claims advanced in that federal case under New Jersey law. On June 24, 1992, the United States Supreme Court rendered its decision. See Cipollone v. Liggett Group, Inc., 505 U.S. ___, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Thereafter, on September 11, 1992, a status conference was conducted and on November 5, 1992, the judge entered an order which established dates for the filing of briefs detailing the facts and legal theories on which the parties intended to rely. Oral argument was scheduled for March 8, 1993.
However, by motion dated December 2, 1992, Budd Larner and Wilentz filed a joint notice of motion for leave to withdraw as counsel in this matter. The motion was directed to appellants, who have been identified as co-executors or co-administrators of the estate of plaintiff Doris Smith.[3] The firms argued that the costs of maintaining this suit were unreasonably burdensome upon them and that they should be allowed to withdraw as counsel in this matter pursuant to RPC 1.16(b)(5).[4] The motion was granted *67 and we granted leave to appeal. We also granted leave for defendants to intervene on their assumption that they are not entitled to be heard as of right on this dispute. They take no position on the merits of the firm's withdrawal applications but dispute the suggestion of dilatory tactics on their part.
Affidavits submitted in support of the withdrawal motion reveal certain uncontested facts. According to Alan M. Darnell, Esq., of Wilentz, "in excess of 20,000 hours have been expended on the tobacco litigation by various attorneys and paralegals employed by the Wilentz firm. Had this time been billed at hourly rates, it would have had a value in excess of $1,750,000. In addition [Wilentz] has spent in excess of $700,000 in direct expenditures" as of November 30, 1992. Edell certified that Budd Larner and Wilentz incurred "more than $1 million in out-of-pocket expenses (not including the costs of more than one million Xerox copies made in-house) and more than $5 million in lawyer and paralegal time" on the eight cases.[5] No breakdown has been provided to show what part of this expenditure of time and money was devoted specifically to the present case. In view of the procedural history which we have summarized, we presume that amount is relatively small.
*68 According to Edell, preparation of the eight related cases (of which the present case is one) required the firms to take eighty days of fact witness depositions on behalf of plaintiffs, and "produced 222 days of fact witness depositions by defendants." Twenty-seven days of expert witness depositions were taken by plaintiffs, while defendants engaged in seventy days of expert witness depositions. Edell further certified that for every day of deposition, the firms had to spend approximately one-and-a-half days in preparation and "[i]n total, the deposition process has taken about a thousand days or four years (Monday through Friday) to complete."
In the lead case of Cipollone, over 100 motions were filed, and most of the motions were argued. There were also four interlocutory applications, one resulting in the grant of an appeal and initial decision on preemption, Cipollone v. Liggett Group, Inc., 789 F.2d 181 (3d Cir.1986), an appeal from the final judgment to the Court of Appeals following a trial of about four months, Cipollone v. Liggett Group, Inc., 893 F.2d 541 (3d Cir.1990), and two petitions for certiorari to the Supreme Court of the United States, one of which was granted resulting in the argument before that Court. The firms claim they have advanced over $500,000 in out-of-pocket expenses and approximately $2,000,000 in lawyer and paralegal time in connection with the Cipollone trial and over $150,000 in out-of-pocket expenses and over $900,000 in attorney and paralegal time in post-trial proceedings.
According to Wilentz and Budd Larner, much work needs to be done in order to prepare this case for trial. Defendants have not yet revealed their anticipated expert witnesses. However, Edell estimates that defendants will name approximately twenty-four experts who will have to be deposed. Edell also contemplates the possibility of retaining new "state-of-the-art and risk/utility experts." According to Darnell,
although an incredible amount of time, effort, and money has been expended in the tobacco litigation to date, much work remains to be done to finish this lawsuit.... [T]wenty-two depositions of persons acquainted with Mrs. Smith have been taken to date. The defendants then contemplated taking at least another ten depositions, *69 including the contemplated completion of the depositions of Leroy and Doris Smith. The depositions of Mr. and Mrs. Smith cannot be taken because both are deceased.
* * * * * * * *
A review of R.J. Reynolds' chart demonstrates that many treating physicians [will] be deposed, many expert witnesses will be named, their reports obtained, and thereafter deposed. With regard to document discovery, plaintiffs' counsel has reviewed over 600,000 documents produced by R.J. Reynolds; some 50,000 documents have been selected for copying by plaintiff's counsel. Document discovery from American Brands is incomplete and would have to be completed as part of the trial preparation process. Depositions of various employees of both R.J. Reynolds and the American Tobacco Co. would have to be taken.
Edell has contacted Richard Daynard, Chairman of the Tobacco Products Liability Project in Boston, which is "a clearinghouse for all lawyers who are prosecuting smoking and health litigation throughout the country," in an effort to enlist the Project's assistance in helping to find replacement counsel for plaintiffs in the instant matter. As of November 1992, Daynard "was unable to identify anyone who would be willing to undertake the representation of plaintiff in this case," in spite of the willingness of both Budd Larner and Wilentz to "forgo reimbursement for its expenses" incurred in the prosecution of the case. Darnell's certification also reflects that "[i]n order to facilitate the retention of substitute counsel by the Smith family" there will be no request "for any reimbursement whatsoever for any of the time or disbursements incurred ... in this and/or in any other tobacco and health lawsuit."[6]
*70 Plaintiffs (now the estate of Doris Smith) contend that the trial judge committed reversible error when he concluded that, pursuant to RPC 1.16(b)(5), Budd Larner and Wilentz should be allowed to withdraw from their representation because it imposed an unreasonable financial burden on the two law firms. The trial judge, in granting the motions to withdraw, explained the dilemma involved as follows:
The emotions may very well favor ... the Estate's side of the ledger.... There's no question about that. But unfortunately for the Estate this isn't a [c]ourt of emotions; this is a [c]ourt that has to decide an issue based upon the facts, the objective facts that are placed before it. And what I have before me is a case on your side that acknowledges that things have occurred that could not be anticipated over the years  the Supreme Court decision, the costs perhaps, the amount of the costs. But, on the other hand, we have experienced lawyers who sign an agreement and should be bound by it, that our goal in this case is a goal based upon principle. Our goal is to show society, show the public the terrible suffering that our parents went through, to show society and to prove to society *71 why they went through that suffering, who caused that suffering and who should be responsible for that suffering, and I would assume your principle is that hopefully it won't happen again to somebody else.... That's your major goal.
The side goal is money, and you acknowledge that there is certainly a possibility that given the substantial costs, the admitted substantial costs that have been paid to date and that will be paid in the future, that despite that we want our principle. We want to show society this principle. We want to carry through with this based upon principle, and we acknowledge that there may not only be [no] return, there may be a negative return.
Counsel through their papers present the same thing in essence. They don't talk about your principle, but they do ask what are the Estate's goals. And they ask that question because they will say, if asked, and I don't have to ask them, that if the goal is principle, there comes a time when we can't afford to operate on the fuel of just principle because notwithstanding the fact that we're a law firm, notwithstanding the fact that we want to help people  hopefully that's what their goals are; I am sure they are  notwithstanding those facts, we can't continue to operate on a specific case when the finances are such that it becomes an unreasonable burden.... It's an unreasonable burden, they say, because of the attorneys' time. It's an unreasonable burden, they say, because of the substantial costs that have been incurred and that will be incurred in the future.
The trial judge then concluded:
While the attorneys' time may be able to be dealt with because we have people doing pro bono work . .., while I can deal with the issue perhaps of attorneys' time and I can perhaps agree with your position on the time spent by counsel  the $5,000,000 of attorneys' time  the issue of costs, the issue of disbursements and expenditures is something else again because that's not time that they can perhaps absorb in their overhead, in their ability to run an efficient law office. The costs are out-of-pocket expenses that they have to pay, and that's what I'm focusing on. It seems to me, based upon what everybody has said, that it is admitted that those costs are substantial, are extremely substantial, will be extremely substantial in the future and that they represent an unreasonable financial burden.
So in light of the fact that there is no issue concerning the fact that there are going to be substantial costs, that there have been substantial costs in the past, it is this [c]ourt's considered opinion that counsel should be relieved not based upon any lack of cooperation because I don't see that as an issue at all, but based upon the RPC's and the fact that they have presented to this [c]ourt that there is an unreasonable financial burden, that it is an unreasonable financial burden to a certain extent because of the goal, the goal of principle because the goal of principle says that's the reason why other lawyers won't take the case because the costs are so great that the fuel of principle is not enough to continue to drive the locomotive to continue the case. And certainly the costs are such that the expectation, a reasonable expectation would be that in the end there would be a negative balance to the law firm, a negative balance by virtue of the fact that they will not recoup the substantial costs, that it will not even be even, it will be negative, and that when weighed against the concept of principle, it seems to me that the scales fall in favor of counsel.

*72 If it were equal, it might be a different result. If they could recoup their costs, it might be a different result, but they will not. And the retainer agreement does say that they get their costs back first. Granted if they lose, they eat their costs. But they have no  they're saying, and I, quite frankly, agree with them, that there is a reasonable likelihood that even if they succeed in the case and they show the world that they can succeed as they somewhat succeeded in the Cipollone case, that it's still an unreasonable financial burden because they'll be in a negative position vis-a-vis their expenditures.
The firms contend that the decision of the trial court was an appropriate exercise of discretion because the amount of money spent and which must be expended in the prosecution of the tobacco cases represents an unreasonable financial burden well above and beyond what was contemplated and what can be expected under the circumstances. The firms also contend that we must defer to the trial judge's exercise of discretion. See Jacobs v. Pendel, 98 N.J. Super. 252, 255, 236 A.2d 888 (App.Div. 1967).
The firms argue that the expenses they incurred in the Cipollone matter should be a guide for determining approximately how much money would be required to be advanced in the representation of plaintiffs in this case. And they claim there is "no reason to believe that this case could be tried in anything less than the more than four months it took to try Cipollone," or with less pretrial discovery and preparation. They also note that "[t]he tobacco industry's defense strategy is to resist discovery, appeal virtually every adverse decision and avoid settlement. The industry does everything it can to cause plaintiffs' attorneys to spend a great deal of money."[7] The essence of the firms' contentions is that defendants have, in reality, succeeded in their goal.
*73 Plaintiffs, on the other hand, contend that when deciding whether representation imposes an unreasonable financial burden, the costs associated with this case should be considered separate and apart from the sums expended in the prosecution of the seven other cases. Plaintiffs argue that the trial judge should not have based his conclusion on a comparison between this case and the expenses that were incurred by the firms in Cipollone, which involved then novel and untested questions of law. Plaintiffs claim they were under the impression their case would be handled separately and would "proceed forward on its own merits." They insist their case stands on different facts and has to be evaluated separately "as to a determination of possible recovery."[8] Moreover, plaintiffs assert that the amount of expenditures provided by the law firms is inaccurate and misleading because the retainer agreement that plaintiffs entered required the firms to represent the Smiths only through the trial and does not require the firms to appeal from an adverse "final decision," whereas the Cipollone expenses included the costs of appeal. Finally, plaintiffs argue that by virtue of the very nature of this case the law firms should have known "at the inception of this litigation that the tobacco companies would vigorously defend the case," giving rise to the costs involved. Plaintiffs insist the firms should have known and projected these expenses and realized that even in the event of a jury verdict in favor of plaintiffs, there was a possibility that the verdict would not be large enough to repay the firms for all the expenditures.
The majority opinion of the United States Supreme Court in Cipollone, delivered by Justice Stevens, stated the governing principles of pre-emption and concluded that the Federal Cigarette *74 Labeling and Advertising Act of 1965 did not pre-empt state law claims against cigarette manufacturers and sellers. However, Justice Stevens' opinion on the pre-emptive impact of the Public Health Cigarette Smoking Act of 1969 did not speak for a majority. His opinion, joined in this respect only by the Chief Justice and Justices White and O'Connor, held that "the 1969 Act preempts petitioner's claims based on a failure to warn and the neutralization of federally mandated warnings to the extent that those claims rely on omissions or inclusions in [the manufacturers'] advertising or promotions; the 1969 Act does not pre-empt petitioner's claims based on express warranty, intentional fraud and misrepresentation, or conspiracy." 505 U.S. at ___, 112 S.Ct. at 2625, 120 L.Ed.2d at 432. Justices Blackmun, Kennedy and Souter, who joined Parts I-IV of the Stevens opinion and dissented from Parts V and VI, found that the 1969 Act did not pre-empt the plaintiffs' state law claims, see 505 U.S. at ___, 112 S.Ct. at 2625, 120 L.Ed.2d at 432 (Blackmun, J. concurring in part and dissenting in part), while Justices Scalia and Thomas concluded that there was pre-emption even under the 1965 Act and that all claims were pre-empted. 505 U.S. at ___, 112 S.Ct. at 2632, 120 L.Ed.2d at 440 (Scalia, J., concurring in the judgment in part and dissenting in part).
While the opinions in Cipollone necessarily settled the preemption principles and resolved disparity on the issue between our Supreme Court and the Third Circuit, a fair reading of Cipollone reveals that it may invite more litigation as to the impact of its holding. See Cipollone v. Liggett Group, Inc. supra, where five members of the Court "speculate[d] as to the difficulty lower courts will encounter in attempting to implement the Court's decision," 505 U.S. at ___, 112 S.Ct. at 2631, 120 L.Ed.2d at 440 (Blackmun, J., concurring in part and dissenting in part, joined by Kennedy and Souter, JJ.) quoted with agreement by Scalia, J. (concurring in part and dissenting in part, joined by Thomas, J.), 505 U.S. at ___, 112 S.Ct. at 2637, 120 L.Ed.2d at 448. Unfortunately, however, the trial judge's analysis of the motion to withdraw does not include detailed consideration of Cipollone or any *75 other decision in terms of cost or impact on the prospects of recovery. It seems apparent, however, that irrespective of the impact of Cipollone on the federal cases (because of the prior Third Circuit opinions), it limited some of the claims available for prosecution in our state courts under Dewey II.
The fact that an experienced attorney cannot be found to represent plaintiffs, notwithstanding the completion of some discovery and extensive legal research, is significant, particularly because the new attorney could represent plaintiffs without being obligated to share any of the recovery with the present firms. See La Mantia v. Durst, 234 N.J. Super. 534, 561 A.2d 275 (App.Div.), certif. denied, 118 N.J. 181, 570 A.2d 950 (1989). The fact that no competent counsel appears willing to invest the time and energy on such basis clearly reflects that withdrawal will have "material adverse effect on the interests" of plaintiffs, RPC 1.16(b). The question before us therefore is whether the representation of plaintiffs in this case will cause such an unreasonable financial burden as to permit withdrawal of counsel under RPC 1.16(b)(5).
On January 26, 1993, about two-and-a-half weeks after the trial judge rendered his decision in this case, Judge Lechner rendered a decision on the same issue in another one of the eight cases. Haines v. Liggett Group Inc., 814 F. Supp. 414 (D.N.J. 1993). In rejecting Budd Larner's application[9] for withdrawal pursuant to RPC 1.16(b)(5), which was deemed to control, 814 F. Supp. at 422, Judge Lechner noted that while the firm had expended "a significant amount of money" in "the aggregate" on "all eight Cigarette Cases," Budd Larner did not particularize "how much money it has spent" in representing Haines alone. Haines, id. at 423. Judge Lechner further explained that "Haines should not lose her representation because Budd Larner has incurred significant expenses in other  similar but separate  matters." Ibid. He opined that Cipollone should not be used as a "yardstick for the *76 determination of potential costs" in Haines. Ibid. The judge stated that "[t]his case is not Cipollone. Whatever may have occurred in Cipollone, that case was not before this court." Ibid.
In determining whether Budd Larner should have been allowed to withdraw from representing Haines based on RPC 1.16(b)(5) Judge Lechner explained:
As Budd Larner recognizes, its noteworthy accomplishments in the Cigarette Cases generally, as well as the decisions rendered by the Third Circuit and the Supreme Court in Cipollone, see 893 F.2d 541 (3rd Cir.1990); ___ U.S. ___, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), set this case in a different procedural posture than Cipollone. Because of Cipollone and the other cigarette cases, much of the groundwork for trial of this case has already been set in place. Prior discovery, in the form of both documents and deposition testimony, can provide the parties with ready data which will decrease the amount of discovery necessary in this case. In addition, as a result of the holdings in Cipollone, the legal issues in this case have been narrowed and clarified; the parties are better able to focus their discovery requests.
In sum, while Budd Larner has demonstrated that it has expended a significant amount of resources in litigating the Cigarette Cases generally, it has not demonstrated a sufficient basis to permit withdrawal absent the consent of Haines.

[814 F. Supp. at 424 (footnotes omitted).][10]
Judge Lechner added that there were additional reasons for denying the motion. He noted the ethical and professional obligations of an attorney and concluded that "withdrawal under these circumstances would be inappropriate," particularly because there was no way to protect plaintiff's interests or "minimize the harm of withdrawal." Id. at 425. In essence, due to the inability of plaintiff "to find any substitute counsel at all, let alone effective substitute counsel," the "action will not go forward." Ibid.
Judge Lechner also noted the important policy considerations this issue presents when he explained that citizens must be allowed to bring lawsuits to vindicate their rights and to receive *77 compensation for their injuries. Id. at 424. He recognized that the plaintiff in Haines "ha[d] relied upon the representation of Budd Larner and its concomitant duty to pursue her cause both diligently and to its completion." Id. at 426 (citing In re Yetman, 113 N.J. 556, 552 A.2d 121 (1989); In re Smith, 101 N.J. 568, 503 A.2d 846 (1986); In re Schwartz, 99 N.J. 510, 493 A.2d 1248 (1985)). Moreover, even if replacement counsel could be found, "Budd Larner is recognized as the leading firm in the field of tobacco products liability litigation" and the plaintiff in Haines may have suffered "severe prejudice" by allowing such replacement. 814 F. Supp. at 425. According to Judge Lechner, "[t]his result [could not] be permitted." Id. at 426.
Judge Lechner also found, "[S]ignificant to the question of withdrawal is the fact that Budd Larner's representation is premised upon a contingency fee arrangement," which is a binding contract involving inherent risks. Ibid. In response to Budd Larner's argument that, if the contract between Haines and the firm was not for legal representation, it would be void on the basis of unilateral or mutual mistake, Judge Lechner explained:
This argument is not compelling in the context of a contingency fee relationship which, by its nature, involves uncertainty and risk and requires the parties to make predictions as to (1) the likelihood of recovery, (2) the length of time until recovery and (3) the probable size of recovery. Given their litigation experience, lawyers are in a better position than clients to make these predictions.
The element of risk, moreover, is an element of contingency fee arrangements. For this reason, "it is generally accepted that a lawyer may receive a contingent fee that would be unconscionably high if it were a guaranteed fee." The argument cannot work both ways; accepting high fees when the risk of litigation pays off and claiming unilateral mistake when the decision and investment go bad are unacceptable.
Having contracted with Haines on a contingency fee basis, Budd Larner cannot now walk away from the contract because the case may not generate the return it expected at the outset  either by judgment and/or additional clients. Contrary to Budd Larner's suggestion, profitab[ility] is not a "basic assumption" of a contingency fee contract. Although Budd Larner entered this contract with Haines because it believed the contract would be profitable, it also knew that in litigation  particularly litigation in which a law firm advances costs and forgoes fees until an expected judgment  there are uncertainties. As with all contingency fee arrangements, Budd Larner knowingly assumed the risk that its arrangement with Haines would not match its initial prediction of costs and returns. It is simply disingenuous *78 to suggest that unilateral or bilateral mistake can be applied in such a context on the ground that cost has exceeded initial predictions.
[Id. at 427 (citations omitted) (footnotes omitted).]
Finally, Judge Lechner noted the importance of contingency fee arrangements in a society where oftentimes "`[l]egal service to the poor is frequently available only through the contingent fee device,'" ibid. (quoting American Trial Lawyers Ass'n v. New Jersey Supreme Court, 66 N.J. 258, 260 n. 4, 330 A.2d 350 (1974)), and explained the adverse policy implications that would flow if he granted Budd Larner's application to withdraw:
If lawyers  after assessing the likelihood of recovery, negotiating a contingency fee and raising the expectations of their client  are permitted to withdraw when contingency fee representation becomes unprofitable or even costly, the purpose of contingency fee litigation will be defeated. Access to justice will not be broadened; it will be constricted. Moreover, as in this case, the contingency fee arrangement will actually have made matters worse.
When a lawyer is permitted to withdraw on the ground that maintaining the litigation has become too costly, finding substitute counsel may well prove to be difficult or even impossible. Individual claims, as well as entire classes of claims, may be stigmatized. As for plaintiffs, the disappointment at having been abandoned mid-stream is likely to undermine faith in the legal system and to reinforce the notion that access to the courthouse is a function of wealth. Simply put, the needs and obligations of the contingency fee system dictate that Budd Larner not be permitted to close the door to the courts which it has opened. To permit withdrawal would be to permit the nullification of any contingency fee contract which later turns out to be less profitable than originally thought.

[814 F. Supp. at 427-28 (footnote omitted).]
We agree with much Judge Lechner had to say, particularly insofar as he recognizes that each case must be examined on its own merits and that the Cipollone expenses may not be replicated in this case. Furthermore, just as Budd Larner did not particularize the amount of money it spent and projected to spend in prosecuting Haines, neither Budd Larner nor Wilentz have demonstrated how much money they have expended or project to spend on this case alone. Instead, they essentially rely on the figures from Cipollone and the other cases in the aggregate to support their assertion that prosecuting this case would constitute an unreasonable financial burden. While the firms entered the *79 agreements they did premise on their expectations of recovery in all cigarette cases in the aggregate, Doris Smith signed an individual retainer agreement; she did not contract to have her case prosecuted jointly. Therefore, while relevant to the projections, the application in this case cannot be decided exclusively by the expenses in other matters.
Budd Larner and Wilentz emphasize that the Cipollone jury only returned a verdict of $400,000 in favor of the plaintiff therein,[11] and that when that figure is compared to the amount expended in the prosecution of the cigarette cases, the net loss represents an unreasonable financial burden on the two firms. However, the Cipollone recovery may not be indicative of how much another jury may award in another case, although there are issues in common. While the Cipollone experience should be evaluated in determining whether an unreasonable financial burden exists here, the different backgrounds of the plaintiffs and their relative ages, overall health and circumstances must be evaluated before the impact of the comparative potential recovery can be decided.
We also recognize, as suggested by Judge Lechner, that a contingency fee contract which is "fair and reasonable in its terms, and freely agreed to by the client after mature deliberation, with full knowledge of the situation, should not be carved away by the court except in an entirely clear case." Hughes v. Eisner, 14 *80 N.J. Super. 58, 65, 81 A.2d 394 (App.Div.), appeal dismissed, 8 N.J. 228, 84 A.2d 626 (1951). See also Kriegsman v. Kriegsman, 150 N.J. Super. 474, 479-80, 375 A.2d 1253 (App.Div. 1977); Gray v. Joseph J. Brunetti Construction Co., 266 F.2d 809, 818 (3rd Cir.), cert. denied, 361 U.S. 826, 80 S.Ct. 74, 4 L.Ed.2d 69 (1959). Moreover, as Judge Lechner suggested, the firm should have expected the cigarette companies to defend the related cases vigorously because of the vast potential exposure they faced.
On the other hand, we cannot forget that the literal wording of our Rule permits withdrawal on the basis of an "unreasonable financial burden" independent of "material adverse effect on the interests of the client." RPC 1.16(b). This is significant where the retainer does not provide for an hourly rate or other compensation which will assure compensation for an attorney's services. Because attorneys are obligated by ethical standards to conduct the litigation in an appropriate fashion and to "fully protect [their] client's interest," see Broder Credit & Collection SVC v. Burton, 193 N.J. Super. 474, 480, 475 A.2d 52 (App.Div. 1984) ("no matter what the amount involved, when an attorney undertakes to represent a client he has an obligation to fully protect his client's interests") (decided under former DR 7-101(A)(1)), there are limits to what can be reasonably expected of counsel when they anticipate no return for their clients or themselves.[12]See State of Missouri, ex rel., Wilke v. Rush, 814 S.W.2d 687 (1991).
We part company with Judge Lechner's analysis to the extent he implicitly declines to permit withdrawal no matter how "unreasonable the financial burden" where there would be a "material adverse effect" on the client, despite the disjunctive language of the Rule. Further, despite the Rule's specific terms, the federal judge found sufficient policy reasons to deny withdrawal for *81 "unreasonable financial burden" because a contingency fee agreement is involved. However, as Professor Charles W. Wolfram, the Charles Frank Reavis, Sr., Professor of Law at the Cornell Law School and Reporter of the Restatement (Third) of the Law Governing Lawyers, stated in his affidavit filed in support of the motion:
Denial of the present motion would serve only to discourage lawyers confronted with requests by clients to pursue ground-breaking claims on their behalf. While the risk of bearing litigation costs and the costs of lawyer and paralegal time without compensation will always exist in such cases if, as here, the lawyer's compensation is contingent, denying permission to withdraw here would threaten otherwise courageous counsel with the need to contemplate that no matter how bleak and desperate the financial costs of carrying litigation costs had become, the firm would be required to stagger on and complete the course. For a court to require such heroic undertakings would also add to the threat of imposed litigation costs that defendants can often dictate in a case through cost-generating and delay-producing moves in the course of the litigation. If anything, such a decision would only add to the incentives of defendants to engage in such practices.
These comments are particularly significant in a day when funding for public interest advocacy and legal services for the poor is becoming increasingly unavailable.
We are satisfied from our review of the record that plaintiffs will suffer a "material adverse effect" if withdrawal by Budd Larner and Wilentz is permitted. However, we nevertheless believe that applications for withdrawal from contingency fee agreements for "unreasonable financial burden" should be evaluated, as contemplated by RPC 1.16(b)(5), by an analysis of the probability of success in the particular case against the costs of prosecuting the claims, with particular emphasis on reasonably anticipated prospective costs as of the date of the application. To establish their positions the firms will be required to show through expert proofs that, more probably than not, foreseeable damages discounted by the likelihood of recovering them will be substantially less than the value of the additional attorney time and expenses that will have to be devoted from the time of the withdrawal application through trial. A plenary hearing may be required if plaintiffs submit expert proofs to contest either the probability of success or the probable cost to prosecute the case appropriately.
*82 Hence, the firms have a burden to overcome before their application to withdraw can be granted. However, given the nature of a contingency agreement and the developments of a case, particularly as here where the developing legal precedent has significant impact on the expectations of recovery, there comes a time when even the most vigorous representation cannot succeed and the costs will far exceed any recovery. If the client were on an hourly fee, there would come a time he or she would call it quits. A contingent fee is in the client's interest because it permits litigation on behalf of a client who could not otherwise afford the hourly rate or lump sum retainer. But because the client has no direct expense (and, as here, disbursements are paid from any recovery), the client cannot insist on continued representation no matter what the cost and prospects of recovery. The trial judge must weigh the competing interests and make his or her decision as a result of the appropriate balance in the circumstances of the given case.
Here, the trial judge was presented with insufficient proofs on which to analyze the probability of recovery on the claims raised by the plaintiffs in this case which survive Cipollone, and the reasonably anticipated prospective costs of achieving such a recovery with respect to these plaintiffs. We therefore remand for reconsideration of the motion.
The trial judge should consider the evidence to be presented and render his decision based on a consideration of the facts of this case and the factors we have identified.
The order permitting withdrawal is reversed and the matter is remanded for further consideration consistent with this opinion.
NOTES
[1] After a hearing, on September 29, 1988, the Wilentz firm was disqualified from participating in Haines v. Liggett Group, Inc., on the basis of the Supreme Court's decision in Dewey v. R.J. Reynolds Tobacco Company, 109 N.J. 201, 536 A.2d 243 (1988), because a Wilentz partner had formerly represented defendant Brown & Williamson Tobacco Corporation in his former practice.
[2] In these cases, the Wilentz partner had not directly represented any defendant, but defendants argued plaintiffs' interests were "materially adverse to the interests of the former client, Brown & Williamson." In its letter opinion, the trial judge found Wilentz "disqualified from representing plaintiffs Barnes, Berko and Smith," but, following the dictates of Dewey and plaintiffs' wishes, the judge permitted Wilentz to "continue in its representation of the plaintiffs despite the appearance of impropriety, rather than an actual conflict...." We ultimately affirmed the order but held that the Wilentz representation is to be "without any compensation." Barnes v. R.J. Reynolds Tobacco Co., 246 N.J. Super. 348, 357, 587 A.2d 667 (App.Div. 1991).
[3] The record reflects that Mr. Smith is also deceased. No issue has been raised about the standing of appellants to pursue this appeal.
[4] The relevant portions of RPC 1.16 read as follows:

(b) Except as stated in paragraph (c), a lawyer may withdraw from representing a client if withdrawal can be accomplished without material adverse effect on the interests of the client, or if:
* * * * * * * *
(5) the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client; or
(6) other good cause for withdrawal exists.
(c) When required to do so by rule or when ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation. (Emphasis added).
[5] Affidavits were also submitted by Thomas F. Campion, Esq., Professor Charles W. Wolfram and Professor Fred S. McChesney, as experts, in support of the motion. Mr. Campion concluded that "Budd Larner has fulfilled its professional obligations to its client and has met the criteria of `good cause' found in RPC 1.16(b)(6)" as well as a basis for withdrawal under RPC 1.16(b)(5).
[6] The contingent fee agreement here provided:

Doris Smith hereby agrees to retain Budd, Larner, Kent, Gross, Picillo, Rosenbaum, Greenberg & Sade, P.C. as her attorney to represent her with respect to all claims against various manufacturers of cigarettes ... arising out of my sustaining lung cancer diagnosed in 1982 which caused me to sustain personal injuries and/or property damage.
* * * * * * * *
Although the client has been advised of [her] right to retain the attorney under an arrangement whereby [she] would compensate the attorney on the basis of the reasonable value of his services, the client and attorney agree that the attorney shall be paid a fee, contingent in whole, to be computed as follows:
33 1/3% on the first $250,000 recovered;
25% on the next $250,000 recovered;
20% on the next $500,000 recovered; and on any amount recovered in excess of the above by application for reasonable fee to be made on written notice to the judge assigned for determination of such fee.
* * * * * * * *
In the event there is no recovery, the client shall not be obligated to pay the attorney a fee for his services, or reimburse any expenses[.]
* * * * * * * *
The above contingent fee shall be computed on the net recovery arrived at by deducting from the gross recovery all disbursements in connection with the institution and prosecution of the claim, including investigation expenses, expenses for expert or other testimony or evidence, the cost of briefs and transcripts on appeal, and any interest included in a judgment pursuant to R. 4:42-11(b).
* * * * * * * *
The fee shall include legal services rendered on any appeal, review proceeding or retrial, but this shall not be deemed to require the attorney to take an appeal.
* * * * * * * *
The attorney reserves the right, pursuant to R. 1:21-7(f) to make further application to the Assignment Judge on written notice to the client for an additional fee should the attorney, at the conclusion of the matter, deem the fee provided for by this arrangement to be inadequate.
[7] In support of this argument respondents refer to a memo written by J. Michael Jordan, an attorney for R.J. Reynolds, which noted:

[T]he aggressive posture we have taken regarding depositions and discovery in general continues to make these cases extremely burdensome and expensive for plaintiffs' lawyers, particularly sole practitioners. To paraphrase General Patton, the way we won these cases was not by spending all of Reynolds' money, but by making that other son of a bitch spend all his.
[8] On the other hand, plaintiffs note that the firms looked at the cases as a package, stating that "the law firms knew, at the inception, that no one case would bring in enough of a verdict to repay all of the costs of litigation but the firms took a gamble that they would get enough cases, so that settlements would easily come in after the first case was won." They also suggest that the firms realized they would lose some money for the publicity and reputation which would flow from their efforts.
[9] As previously noted, only Budd Larner was acting as attorney for plaintiff in Haines because Wilentz had been disqualified from that matter.
[10] Judge Lechner, like plaintiffs here, noted that "[t]here simply is no way to predict the verdict which a jury in this case might render; Budd Larner has not presented any reason why a verdict in favor of Haines would be limited by the amount rendered in Cipollone." 814 F. Supp. at 525 n. 25.
[11] The Cipollone jury rejected all of plaintiff's fraudulent misrepresentation and conspiracy claims but determined that the defendant Liggett "had breached its duty to warn and its express warranties before 1966." Cipollone v. Liggett Group, Inc., supra, 505 U.S. at ___, 112 S.Ct. at 2615, 120 L.Ed.2d at 420. The jury, however, determined that the plaintiff was 80% responsible for her own injuries because she assumed the risk by smoking cigarettes. 505 U.S. at ___, 112 S.Ct. at 2615, 120 L.Ed.2d at 420. Thus, the plaintiff's estate received no compensation for her injuries. Rather, the $400,000 verdict was awarded to compensate the plaintiff's husband "for losses caused by respondents' breach of express warranty." 505 U.S. at ___, 112 S.Ct. at 2615, 120 L.Ed.2d at 420. The Third Circuit remanded for a new trial on grounds not reviewed by the Supreme Court. 505 U.S. at ___, 112 S.Ct. at 2615, 120 L.Ed.2d at 420.
[12] The draft Restatement of the Law Third, Restatement (Third) of the Law, The Law Governing Lawyers (Tent.Draft No. 5, March 16, 1992), § 44, does not expressly recognize the ability to withdraw for unreasonable financial burden.