594 N.W.2d 514 (1999)
234 Mich. App. 421
In re WITHDRAWAL OF ATTORNEY.
John Chappel Cain, Raymond C. Whalen, Jr., Elton Floyd Mizell, Paul Allen Dye, John Chandler Ewing, Delbert M. Faulkner, and C. Pepper Moore, Plaintiffs-Appellees,
and
Mary Glover and Serena Gordon, Intervening Plaintiffs-Appellees,
v.
Department of Corrections, Deputy Director Daniel Bolden, Warden Sally Langley, and Warden Joan Yukins, Defendants.
Docket No. 211416.
Court of Appeals of Michigan.
Submitted October 13, 1998, at Lansing.
Decided March 12, 1999, at 9:00 a.m.
Released for Publication June 10, 1999.
Chiamp and Associates, P.C. (by Steven M. Hickey), Detroit, for the appellant.
Before: TALBOT, P.J., and McDONALD and NEFF, JJ.
TALBOT, P.J.
Appellant Chiamp and Associates, P.C. (the Chiamp firm) appeals by leave granted from the Court of Claims' order denying its motion to withdraw from representing *515 intervening plaintiffs. MCR 2.117(C)(2).
The order before us represents only the most recent of the Chiamp firm's ongoing efforts to extricate itself from a lawsuit initiated by its former associate, Charlene Snow. There have been two motions to withdraw from representing the intervening plaintiffs, and three hearings, regarding the question whether continued representation would result in an unreasonable financial burden to the Chiamp firm. MRPC 1.16(b)(5). The first motion to withdraw was denied by the trial court in January 1997. The Chiamp firm did not appeal from that ruling. The Chiamp firm's second motion to withdraw was denied following a hearing held in March 1998. The Chiamp firm appealed the trial court's denial of its second motion to withdraw. This Court stayed trial in the underlying litigation and remanded for a hearing regarding the Chiamp firm's motion before a different Court of Claims judge, citing Smith v. R.J. Reynolds Tobacco Co., 267 N.J.Super. 62, 630 A.2d 820 (1993); MRPC 1.16(b)(5). On remand, the hearing judge concluded in December 1998, that the Chiamp firm was not entitled to withdraw from representation. We now reverse and remand.
The background of this litigation is outlined in Cain v. Dep't of Corrections, 451 Mich. 470, 548 N.W.2d 210 (1996). The underlying lawsuit began in April 1988, when a class of over 36,000 male state prison inmates filed a complaint against the Michigan Department of Corrections challenging a new MDOC policy directive that restricted a prisoner's right to possess property on the basis of his security classification. In addition to their complaint, the prisoners successfully petitioned the court to enjoin the MDOC from implementing its policy.[1] The prisoners were not represented by counsel, proceeding in propria persona. In September 1988, the intervening plaintiffs, approximately 1,800 female state prison inmates, were allowed to intervene in the Cain lawsuit. These intervening plaintiffs were represented by attorney Charlene Snow at the time of their intervention and throughout these proceedings. Two other attorneys, Deborah LaBelle and Donna Tope, also made appearances, signed pleadings, participated in discovery, and acted as counsel for the intervening plaintiffs at different times throughout Cain's lengthy history.
Snow apparently accepted the intervening plaintiffs case on a contingent fee basis, hoping to recover money damages and attorney fees based on an alleged violation of 42 USC 1983. Snow indicated that there was an oral agreement between intervening plaintiffs and Snow, but the details of the agreement are less than clear. According to Snow, she was "relying on the clients that there was an understanding" that counsel would be paid, and that she "would expect that the clients would expect a one-third kind of division." Snow acknowledged that there was no agreement regarding costs and that she was "not sure we even thought about it."
In 1990, Snow joined the Chiamp firm as an associate. At that time the Chiamp firm was a three-lawyer firm. Carole Chiamp (Chiamp) is the owner and president of the firm, which specializes in divorce. According to Chiamp, when Snow joined the Chiamp firm, Chiamp was led to believe that the Cain trial would begin within six months to one year, and take about three weeks to try. Contrary to Chiamp's expectations, trial was repeatedly delayed for several years.
In November 1996, the trial court dismissed intervening plaintiffs' claims brought pursuant to 42 USC 1983, effectively precluding any realistic possibility that Snow or the Chiamp firm could recover attorney fees as a result of the litigation.[2] *516 At that point, the Chiamp firm moved to withdraw as counsel for intervening plaintiffs. The trial court denied the motion.
That same year, in the underlying lawsuit, our Supreme Court ordered the trial court to investigate the possibility of appointing counsel to represent the male prisoners and directed the trial court and parties to prepare an expedited scheduling calendar. Cain, 451 Mich. at 518, 548 N.W.2d 210. Prison Legal Services was appointed to represent the male inmates. The Supreme Court directed that the case be resolved swiftly. Despite the Supreme Court's directive, presentation of the male inmates' evidence did not begin until April 1997, and continues even to this day. Snow was required to attend trial during presentation of the male inmates' case from April 1997 through February 1998. At the end of February 1998, the male inmates still had well over one hundred class member witnesses to present.
In late February 1998, the Chiamp firm again moved to withdraw as intervening plaintiffs' counsel pursuant to MCR 2.117 and MRPC 1.16(b)(5) and (6). The Chiamp firm presented affidavits asserting that Snow had been attending trial in the Cain matter four to five days a week for the past ten months, and that the trial had occupied between ninety-five and one hundred percent of her legal work during that time, with little or no work performed on other cases. Because of the Cain trial, Snow had taken on no cases for the Chiamp firm since April 1997. The Chiamp firm asserted that because Snow spent thousands of hours on Cain, the firm lost hundreds of thousands of dollars that would otherwise have been earned. Although Snow and the Chiamp firm received approximately $50,000 in fees as the result of various contempt sanctions imposed against defendants, the firm still incurred costs for which it had not been reimbursed.
At the hearing regarding the Chiamp firm's second motion to withdraw, Chiamp indicated that although she was given various dates for the start of the intervening plaintiffs' portion of the trial, these dates passed as the male inmates' trial continued with no end in sight. The trial court later acknowledged, during a July 1998 telephone conference, that Chiamp was receiving only "second hand information" about the Cain case and informed her that it was ready to hear evidence regarding the intervening plaintiffs' case at any time but that Snow and her cocounsel were not ready.
In ruling on the Chiamp firm's second motion to withdraw, the trial court initially noted that it appointed counsel for the male inmates because of the Supreme Court's opinion directing it to do so, and that it lacked the authority to appoint counsel to represent intervening plaintiffs. Although the parties do not challenge the trial court's finding in this regard, we note that the Supreme Court's order to investigate the possibility of counsel for the male prisoners in no way precluded the court from considering the necessity of appointed counsel for the intervening plaintiffs.
Following the hearing regarding the Chiamp firm's second motion to withdraw, the trial court found that withdrawal would have a serious disruptive effect on the trial of the case, the administration of justice, and the rights of the litigants. The trial court again denied the Chiamp firm's motion to withdraw.
The Chiamp firm filed an application for leave to appeal the denial of its second motion to withdraw. At some point after the application was filed in this Court, the Chiamp firm terminated Snow's employment. Chiamp told Snow to take the Cain file with her when she left, but Snow refused. Following the termination, Snow *517 and Chiamp each tried to pass the burden of representing intervening plaintiffs on to the other lawyer. Snow even wrote a letter to intervening plaintiffs disengaging herself from the case.
This Court granted the Chiamp firm's application for leave to appeal. We remanded the case to a different Court of Claims judge to determine three pertinent issues: (1) whether the Chiamp firm is one of the attorneys of record for intervening plaintiffs, (2) whether intervening plaintiffs desire that the Chiamp firm continue to represent them in the continuing litigation before the trial court, and, if so, (3) whether continued representation by the Chiamp firm would result in an unreasonable financial burden so that it should be permitted to withdraw from representation. Smith, supra; MRPC 1.16(b)(5).
The remand hearing took six days and involved testimony from numerous witnesses. Snow's counsel informed the hearing court that, since being terminated by the Chiamp firm, Snow had not practiced law. However, all witnesses agreed that Snow had been lead counsel for intervening plaintiffs. There was ample evidence that all the discovery, court appearances, and other substantive work on intervening plaintiffs' case were performed either by Snow or by other attorneys not affiliated with the Chiamp firm. Chiamp's only appearances before the trial court in this matter were made in connection with her motion to withdraw. Chiamp never met intervening plaintiffs' class representatives until the hearing regarding the first motion to withdraw. Counsel for the MDOC testified that he did not consider Chiamp to be counsel on the Cain case and that he never discussed any substantive matter involving the Cain case with Chiamp.
Snow testified that she "implored and implored" Chiamp to allow another attorney from the Chiamp firm to help with the Cain case but that, throughout Snow's employment with the Chiamp firm, Chiamp refused to allow any other Chiamp firm attorney to work on Cain. Indeed, when Snow needed an attorney to substitute for her at trial, Snow herself hired and paid for the substitute attorney out of her own pocket. There was no dispute that Chiamp did not consider Cain an appropriate case for the firm and that, from the beginning of Snow's employment with the firm, Chiamp pressured Snow to finish the case as soon as possible. Snow testified that she disagreed with Chiamp's decision to file the two motions to withdraw.
Despite the fact that Chiamp and her remaining associate performed no discovery or other substantial work on the case, intervening plaintiffs' class representatives all stated that they believed that Chiamp was their lawyer and expressed a desire to have the Chiamp firm continue to represent them.[3] The hearing court found that the Chiamp firm was one of the counsel of record for intervening plaintiffs and that the Chiamp firm remained obliged to represent them at trial.[4]
The hearing court also found that Snow's cocounsel, Deborah LaBelle and Donna Tope, were both attorneys for intervening plaintiffs, although the court "would hope" that LaBelle would only be asked to assist for "the very limited purpose *518 of the classification issue." With regard to Snow, the hearing court implicitly found that Snow's personal responsibility to intervening plaintiffs ended when she became an employee of the Chiamp firm and that her cases had "merged into the firm" at that time. The hearing court also found that, because Snow was "retired" from the practice of law, it could not force her to practice law and represent intervening plaintiffs. The court found, therefore, that Snow had no obligation to represent intervening plaintiffs as long as she did not practice law.
After determining that the Chiamp firm was an attorney of record and that intervening plaintiffs desired the firm's continued representation, the hearing court heard evidence concerning whether withdrawal should be allowed because of an unreasonable financial burden. There was testimony that Snow, using Chiamp firm support staff, had already spent 4,467 billable hours on this litigation, which would have been worth approximately $777,850 in legal fees if billed at the firm's usual rate. Snow and the MDOC's trial counsel both indicated that an additional one thousand hours or more of work would be required of intervening plaintiffs' counsel before conclusion of the trial.
In contrast with the remaining work that would be required to complete trial on this case, there was evidence that it was unlikely that intervening plaintiffs would receive any significant recovery of monetary damages as a result of this litigation. It was apparent from the testimony at the remand hearing that, since dismissal of the § 1983 claim, intervening plaintiffs had virtually no likelihood of recovering an award of money damages or attorney fees from defendants. Snow testified that intervening plaintiffs' counsel would receive a portion of any money damage award as their fee, but was unclear about what legal or factual basis would justify an award of money damages. Snow initially testified that intervening plaintiffs could be awarded damages for wrongful administrative segregation claims, and she estimated those damages as hundreds of thousands of dollars. When pressed on cross-examination, Snow admitted that there would not be any actual award of money damages to intervening plaintiffs under that claim, but instead that they would seek a fee award based on a common fund theory. Snow theorized that the state was overspending between $3 million to $10 million a year in unnecessarily high security classifications, and "I would have attempted to make a common fund argument around those moneys." Snow admitted that she had previously doubted the viability of seeking attorney fees under a common fund theory and that she asserted a common fund theory at the suggestion of the trial judge following his dismissal of the § 1983 claim.
At the conclusion of the proceedings on remand, the hearing court "was not able to make a determination that there is an unreasonable financial burden on appellant" and refused to let the Chiamp firm withdraw as counsel.
On appeal, the Chiamp firm argues that, under the circumstances of this case, it should be allowed to withdraw from representing intervening plaintiffs. We agree.
An attorney who has entered an appearance may withdraw from the action or be substituted for only with the consent of the client or by leave of the court. MCR 2.117(C)(2); State Bar of Michigan v. Daggs, 384 Mich. 729, 732, 187 N.W.2d 227 (1971). We review a trial court's decision regarding a motion to withdraw for an abuse of discretion. People v. Echavarria, 233 Mich.App. 356, 368-369, 592 N.W.2d 737 (1999); People v. Nard, 78 Mich.App. 365, 370, 260 N.W.2d 98 (1977). We conclude that the hearing court abused its discretion in ruling that withdrawal was not warranted because of an unreasonable financial burden.
Michigan Rule of Professional Conduct 1.16(b) provides:

*519 [A] lawyer may withdraw from representing a client if withdrawal can be accomplished without material adverse effect on the interests of the client, or if:

* * * * * *
(5) the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client.
The Rules of Professional Conduct are applicable to attorney discipline proceedings, MRPC 1.0(b), and do not expressly apply to counsel's motion to withdraw. We find it logical, however, to consider the question of withdrawal within the framework of our code of professional conduct. Because there is no Michigan law regarding the issue of unreasonable financial burden on counsel, we look to other states' decisions for instruction. We find particularly helpful two New Jersey cases, presented by the parties, that analyze the issue in the context of professional responsibility.
In Smith, supra at 76, 630 A.2d 820, and Haines v. Liggett Group, Inc., 814 F.Supp. 414, 422 (D.N.J., 1993), two different courts considered application of a New Jersey rule of professional conduct that is identical to MRPC 1.16(b)(5). Factually, the two cases are virtually identical. Both cases involve the Budd Larner firm's attempt to withdraw, despite a written contingent fee agreement, from representing the estate of a deceased smoker in a products liability action. The law firm's motion to withdraw in each case was based on the unreasonable financial burden provision contained in the New Jersey Rules of Professional Conduct (RPC) 1.16(b)(5). Both the Michigan and the New Jersey rules provide that an attorney's withdrawal is permitted if it can be accomplished without material adverse effect on the client, or, in the alternative, if the representation will result in an unreasonable financial burden on the lawyer.
In Haines, supra at 424, the law firm's motion to withdraw was considered by the federal district court. The court rejected the theory that economic hardship alone would permit a lawyer to withdraw under New Jersey's version of Rule 1.16(b), where withdrawal could harm the client's interests. The court reasoned that, contrary to the law firm's assertions, the motion for withdrawal implicated concerns other than money:
At stake is the ability of citizens to bring and maintain suits for the purpose of vindicating rights and receiving compensation for injuries, as well the ability of clients to rely upon the representation of and the agreements with their attorneys.

* * * * * *
"An attorney has certain obligations and duties to a client once representation is undertaken. These obligations do not evaporate because the case becomes more complicated or the work more arduous or the retainer not as profitable as first contemplated or imagined. Attorneys must never lose sight of the fact that the profession is a branch of the administration of justice and not a mere money-getting trade.... The lawyer should not throw up the unfinished task to the detriment of his client." [814 F.Supp. at 424, quoting Kriegsman v. Kriegsman, 150 N.J.Super. 474, 480, 375 A.2d 1253 (1977)].
The Haines court reasoned that "[t]he element of risk ... is an element of contingency fee arrangements" and denied the law firm's motion to withdraw. 814 F.Supp. at 427.
In Smith, supra, the New Jersey Superior Court, Appellate Division, reversed the trial court's grant of the law firm's motion to withdraw and remanded for further proceedings. The Smith court rejected the federal court's interpretation in Haines of New Jersey law. The court found that Haines simply ignored that the "literal wording of our Rule [1.16(b) ] permits withdrawal on the basis of an `unreasonable financial burden' independent of `material adverse effect on the interests of *520 the client.'" 267 N.J.Super. at 80, 630 A.2d 820. The fact that no adequate replacement counsel could be found who was willing to pursue plaintiffs' case on a contingency basis was evidence that withdrawal would have material adverse effect on the interests of plaintiffs under RPC 1.16(b). That consideration by itself, however, would not preclude withdrawal based on RPC 1.16(b)(5) where continued representation would cause an unreasonable financial burden on plaintiffs' counsel. 267 N.J.Super. at 80, 82, 630 A.2d 820. The Smith court recognized an attorney's duty to a client, but held that such representation must have reasonable limits: "[b]ecause attorneys are obligated by ethical standards to conduct the litigation in an appropriate fashion and to `fully protect [their] client's interest,' ... there are limits to what can be reasonably expected of counsel when they anticipate no return for their clients or themselves." Id. at 80, 630 A.2d 820.
The Smith court also rejected the Haines analysis of contingent fee contracts. Although accepting a case on a contingent fee contract involves some element of risk, there could be situations where the case becomes so onerous to counsel that withdrawal should be allowed:
[T]here comes a time when even the most vigorous representation cannot succeed and the costs will far exceed any recovery. If the client were on an hourly fee, there would come a time he or she would call it quits. A contingent fee is in the client's interest because it permits litigation on behalf of a client who could not otherwise afford the hourly rate or lump sum retainer. But because the client has no direct expense ... the client cannot insist on continued representation no matter what the cost and prospects of recovery. [267 N.J.Super. at 82, 630 A.2d 820 (emphasis added).]
Although the two New Jersey cases reached different conclusions, both courts recognized the importance of balancing counsel's obligation to the client, the extent of the financial burden, and the availability of substitute counsel. Because it is possible for a plaintiff to prevail without collecting money damages, and because MRPC 1.16(b)(5) speaks in terms of the financial burden on counsel, one appropriate consideration is the availability of attorney fees. It does not appear that there is any reasonable likelihood that intervening plaintiffs will recover either money damages or attorney fees here even if they litigate their claims to a successful conclusion. Dismissal of the § 1983 claim left intervening plaintiffs with little or no likelihood of recovering attorney fees in this case. The parties have not suggested, and this Court has not found, any Michigan statutory provisions that would allow for recovery of fees in intervening plaintiffs' class action. We find Snow's suggestion of a common fund theory speculative at best.[5]
*521 Moreover, testimony established that intervening plaintiffs' case will take somewhere between one thousand and fourteen hundred hours of additional attorney work to complete.[6] Intervening plaintiffs' case has reached a point where the costs of continued litigation outweigh any potential recovery.
In addition, unlike either of the New Jersey cases, this case does not involve a written contingent fee agreement. To the extent that intervening plaintiffs are relying on any contingent fee agreement, that agreement was made with Snow individually. Nor is this a case where, except for the Chiamp firm, there is no available substitute counsel. As noted previously, the Chiamp firm is the least experienced available counsel in both this area of practice and this particular lawsuit. In light of the genesis of this action, the anticipated cost, the other available counsel and, especially in light of the burden of expense already carried by the Chiamp firm, it is not reasonable to require the Chiamp firm to continue to represent intervening plaintiffs.
During the hearing, the hearing court also found that, because attorney Charlene Snow was retired from the practice of law, it could not force her to represent intervening plaintiffs and concluded that Snow had no obligation to represent her former clients as long as she did not practice law. Whether Ms. Snow remained obligated to represent intervening plaintiffs was beyond the scope of this Court's remand order. Snow has not personally moved to withdraw from representing intervening plaintiffs, and she is not a party to this appeal. Therefore Snow remains obligated to represent intervening plaintiffs until relieved of that obligation by the trial court or until she is no longer licensed to practice law in this state.[7]
We reverse the hearing court's order denying appellant Chiamp and Associates, P.C.'s motion to withdraw as counsel. We vacate the hearing court's order permitting attorney Charlene Snow to withdraw from representing intervening plaintiffs. We remove the stay on intervening plaintiffs' litigation and remand the case to the Court of Claims for trial. We do not retain jurisdiction.
NOTES
[1] Nearly ten years later, in December of 1997, the trial court entered an order permitting the MDOC to begin implementing its new property policy. In accordance with the trial court's orders, the MDOC began implementing the new property policy in August 1998.
[2] Intervening plaintiffs' remaining claims apparently include a "property issue after implementation of the new MDOC policy directive," "classification," and "access to courts."
[3] It is not clear from the record that intervening plaintiffs had enough information about their representation needs to competently express their desire to use the Chiamp firm as counsel. It is undisputed that, although an experienced and competent attorney, Chiamp and the Chiamp firm have no expertise in class actions, prisoners' issues, or any aspect involved in the Cain litigation. Ironically, Snow, LaBelle, and Tope each have far stronger credentials than the Chiamp firm to act as counsel in this matter for intervening plaintiffs. Indeed it appears that the only area where the Chiamp firm surpasses the other available counsel is in its ability to pay the costs of the lawsuit.
[4] The court apparently based its decision on the premise that Snow's personal files automatically "merged into" the Chiamp firm when Snow was hired. We make no finding regarding the court's "merge" theory. MCR 2.117(B)(3)(a), (b).
[5] Michigan law does recognize the right of a successful class representative to an award of attorney fees under the common fund exception, where the prevailing party creates a common fund on behalf of himself and other class members. In re Attorney Fees of Kelman, Loria, Downing, Schneider & Simpson, 406 Mich. 497, 504, 280 N.W.2d 457 (1979); Grigg v. Michigan Nat'l Bank, 405 Mich. 148, 192, 274 N.W.2d 752 (1979); Bond v. Ann Arbor School Dist., 383 Mich. 693, 704-706, 178 N.W.2d 484 (1970). In such cases, the successful attorney's fees can be deducted from the total sum of all amounts awarded to class members before those awards are distributed to the class members. Id. The purpose behind this rule is to prevent unjust enrichment of class members at the expense of those class representatives who actually pursued the litigation.

Although the trial judge left open the option that intervening plaintiffs could seek a fee award under a common fund theory, the prospect of such a fee award is questionable under the circumstances. Intervening plaintiffs' current theory is not that the combined amounts of small damage awards to individual class members could be considered a common fund from which to pay attorney fees. Instead, Snow posited the argument that the MDOC's additional expenditures for administrative segregation and high security classification of women inmates can be considered a common fund from which to award fees to intervening plaintiffs if they succeed in striking down the challenged security classifications. This theory certainly stretches Michigan's common fund exception, because it does not even involve a common fund.
[6] These estimates appear conservative in light of the history of this case.
[7] A review of the hearing judge's statements at the remand hearing indicates that he may have been under the mistaken impression that Snow had retired her active membership in the State Bar of Michigan and therefore could no longer legally represent intervening plaintiffs.